# Third District Court of Appeal

### State of Florida

Opinion filed July 29, 2015.

_____

No. 3D09-280
Lower Tribunal No. 01-8287D

_____

**John J. Connolly, Jr.,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Stanford Blake, Judge.

Carlos J. Martinez, Public Defender, and Manuel Alvarez, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Linda Katz, Assistant Attorney General; Katherine Fernandez Rundle, State Attorney, and Joel D. Rosenblatt and Michael Von Zamft, Assistant State Attorneys, for appellee.


Before SUAREZ, C.J., and WELLS, SHEPHERD, ROTHENBERG, LAGOA, SALTER, EMAS, FERNANDEZ, LOGUE and SCALES, JJ.

<u>ON MOTION FOR REHEARING EN BANC</u>


ROTHENBERG, J.

Based on the State of Florida's ("the State") motion for rehearing/rehearing en banc, we grant rehearing en banc, withdraw this Court's opinion issued on May 28, 2014, and issue the following en banc opinion affirming John J. Connolly, Jr.'s ("the defendant") conviction for second degree murder with a firearm in its stead.

As the State correctly noted in its opening statement at the en banc oral argument before this Court, and which is supported by the record:

> John Connolly [was] not an innocent FBI Agent sitting at his desk a thousand miles away from the murder. John Connolly [was] the primary mover who started the murder in action. It was his phone call to Whitey Bulger telling him that the FBI [was] going to question— [was] looking for John Callahan—going to squeeze him—if they squeeze him he will talk, if he talks we will all go to jail. You gotta get Johnny Martorano and have him take care of him. That was the initial act which caused the death of the victim. . . . Defendant's act as an aider and abettor, an accessory before the fact, became a crime once the crime was committed here in Florida.

The defendant and his co-defendants were charged with first degree premeditated murder (Count I) and conspiracy to commit first degree murder (Count II). The defendant and co-defendants were tried separately, and the jury convicted the defendant of second degree murder with a firearm as a lesser included offense of first degree murder. The second degree murder conviction was reclassified from a first degree felony to a life felony pursuant to section 775.087(1), Florida Statutes (1981), based on the jury's specific finding that the defendant was armed with a firearm during the acts giving rise to his liability for second degree murder.

The defendant does not dispute the sufficiency of the evidence relied on by

2

the jury in finding him guilty of second degree murder, nor does he dispute that he carried a firearm on his person during the acts he committed as a principal to the murder. The evidence as to both his participation in the murder and his possession of a firearm during his participation is overwhelming. Rather, the defendant disputes the legality of the reclassification of the second degree murder from a first degree felony to a life felony even though the reclassification was based on his actual possession of a firearm. The reclassification issue is dispositive, as it is undisputed that the indictment was filed in 2005 and the homicide was committed in 1982. Thus, without the reclassification from a first degree felony to a life felony, the defendant's conviction must be vacated due to the expiration of the four-year statute of limitations for first degree felonies pursuant to the law that was in effect in 1982.[1] § 775.15(2)(a), Fla. Stat. (1981).

The defendant contends that the firearm reclassification was error because: (1) there was a defect in the charging document; (2) the jury verdict was insufficient to subject him to reclassification; (3) reclassification cannot be based on a co-defendant's use of a firearm during the commission of the offense; and (4) there was no evidence that the defendant carried a firearm during the commission of the murder.

---

[1] Presently, a prosecution for "a felony that resulted in a death may be commenced at any time." § 775.15(1), Fla. Stat. (2014).

As will be detailed herein: (1) the defendant failed to raise an objection to any defect in the charging document and therefore waived his objection to the indictment, and no fundamental error has been demonstrated; (2) his argument regarding the verdict form was also not raised and therefore waived, and it is completely without merit; (3) reclassification of the second degree murder was based on the defendant's personal possession of a firearm during the commission of the homicide, not on the vicarious possession of a firearm by a co-defendant; and (4) there was abundant evidence that the defendant personally carried a firearm during the commission of the homicide.

## SUMMARY OF THE CASE

The 2005 indictment charged the defendant and his co-defendants in Count I as follows:

### Count I

[T]hat on or between the 31st day of July, 1982, and the 2nd day of August, 1982, within the Counties of Miami-Dade and Broward, State of Florida, JAMES J. BULGER, STEPHEN J. FLEMMI, JOHN V. MARTORANO and JOHN J. CONNOLLY, JR., did unlawfully and feloniously kill a human being, to wit: JOHN B. CALLAHAN, from a premeditated design to effect the death of the person killed or any human being, by shooting the said JOHN B. CALLAHAN with a firearm, in violation of s. 782.04(1), s. 775.087 and s. 777.011, Florida Statutes, to the evil example of all others in like cases offending and against the peace and dignity of the State of Florida.

To understand the murder of John B. Callahan ("Callahan") and the defendant's involvement in Callahan's murder, a summary of the evidence

established at trial is necessary. The evidence at trial revealed that Callahan's murder was the last of several murders committed by and/or for the benefit of James "Whitey" Bulger, Stephen Flemmi, John Martorano, and the Winter Hill Gang, an organized crime organization working out of Boston, Massachusetts. The chain of events that led to Callahan's murder began in 1973.

In 1973, the defendant, an agent working for the Federal Bureau of Investigation ("FBI"), was transferred to the Boston office of the FBI where he was assigned to the organized crime division. In 1975, the defendant recruited Bulger and Flemmi to work as FBI informants, and over time, the defendant became corrupted by his relationship with Bulger, Flemmi, and the Winter Hill Gang. Although he provided some of the information he obtained from Bulger and Flemmi to the FBI, the defendant also submitted false and misleading information and reports to the FBI to protect Bulger and Flemmi, and he provided Bulger and Flemmi with confidential FBI and law enforcement information, which enabled Bulger and Flemmi to avoid arrest and prosecution by federal, state, and local law enforcement.

Flemmi testified that the defendant was considered a member of their criminal organization and that he was essentially on their payroll. In exchange for the defendant's services (providing misleading and false information to the FBI and giving Bulger and Flemmi confidential law enforcement information), the defendant was paid large sums of money. Bulger and Flemmi also used the defendant as a

conduit for the delivery of cash and gifts from Bulger and Flemmi to other FBI agents. Thus, the defendant was working both sides and profiting from each. He benefited professionally by providing organized crime information to the FBI, and he benefited personally and financially by assisting Bulger and Flemmi.

The jury learned about some of the confidential information the defendant provided to Bulger and Flemmi. For example, in 1976, the defendant warned Bulger and Flemmi that Richard Castucci, another FBI confidential informant, had given the FBI the location of two Winter Hill Gang members who were federal fugitives. Based on the information provided to them by the defendant, Bulger and Flemmi warned the two fugitives, and they, along with Martorano, murdered Castucci for his disclosures to the FBI. In 1978, the defendant also warned Bulger and Flemmi that they were about to be indicted in a federal racketeering case, but the defendant told them that if they agreed not to kill Anthony "Tony" Ciulla, who was cooperating with the government as a witness against members of their criminal organization, Bulger and Flemmi would not be indicted. Additionally, the defendant warned Bulger and Flemmi that Martorano was going to be indicted. As a result, Martorano went into hiding in Miami.

In 1978, Callahan, the victim in the instant case, was the owner and president of World Jai Alai. When Callahan learned that the authorities in Connecticut had discovered his ties to the Winter Hill Gang and other organized crime figures in

Boston, he sold World Jai Alai to Roger Wheeler ("Wheeler"). Four years later, when Callahan decided that he wanted to repurchase World Jai Alai from Wheeler, but Wheeler refused to sell, Callahan solicited Bulger, Flemmi, and Martorano to murder Wheeler. On May 27, 1981, Martorano shot and killed Wheeler at a country club in Tulsa, Oklahoma.

During its investigation of the Wheeler murder, the FBI began searching for members of the Winter Hill Gang to cooperate with the FBI. Brian Halloran ("Halloran"), a member of the Winter Hill Gang who had been indicted for an unrelated murder in Boston, agreed to cooperate with the FBI in the Wheeler murder investigation in order to obtain leniency in his pending case.

When the defendant learned from his supervisor, Special Agent John Morris, that Halloran was cooperating with the FBI and that Halloran had implicated Bulger and Flemmi in the Wheeler murder, the defendant warned Bulger and Flemmi. After this initial warning, the defendant contacted Bulger and Flemmi again to warn them that the FBI had outfitted Halloran with a body wire and had directed Halloran to meet with Callahan. After being alerted by the defendant, Bulger and Flemmi warned Callahan that Halloran intended to inform on him, and Bulger, with the help of other Winter Hill Gang members, murdered Halloran.

Because the Halloran murder was committed on a public street in Boston, the investigation intensified. In an effort to deflect suspicion away from Bulger,

7

Flemmi, and the Winter Hill Gang, the defendant prepared and submitted a series of false reports suggesting that other organized crime factions in Boston were responsible for Halloran's murder. Despite the defendant's efforts, the FBI continued to believe that Bulger and Flemmi were involved in the Wheeler and Halloran murders, and its investigation focused on locating Callahan to obtain his cooperation. When the defendant learned that the FBI was looking for Callahan, the defendant contacted Bulger and Flemmi and told them that Callahan would likely cooperate and implicate Bulger, Flemmi, and Martorano in the Wheeler murder, and the defendant suggested that they contact their hit man, Martorano, to "handle it" so none of them would be caught.

Thereafter, Bulger and Flemmi met with Martorano, informed him what the defendant had told them, and Martorano agreed to kill Callahan before the FBI could locate him, specifically agreeing to kill Callahan in Florida because of the "heat on them" in Boston. After meeting with Martorano, Bulger and Flemmi met with the defendant and told the defendant that Martorano and his associate, Joe MacDonald, were going to "take care of" Callahan. Flemmi testified that the defendant clearly knew that "tak[ing] care of" Callahan meant they were going to have Callahan killed based on the information the defendant had given them—that the FBI would find Callahan, who would likely cooperate with the FBI and implicate Bulger, Flemmi, and Martorano in Wheeler's murder. On July 31, 1982, Martorano met Callahan at

8

the Fort Lauderdale Airport, shot Callahan in the back of the head, put Callahan in the trunk of a car, and left the car and body at the Miami International Airport.

In anticipation of Callahan's murder, the defendant filed false reports with the FBI in an effort to mislead the FBI and to protect Bulger and Flemmi. In these reports, the defendant provided alibis for Flemmi and Bulger for both the Halloran murder and the planned Callahan murder, and the defendant also falsely reported that Callahan had a falling-out with a group of Cuban drug dealers in Miami in order to deflect the FBI's attention away from Flemmi, Bulger, and Martorano.

After Callahan was murdered, the FBI and other law enforcement agencies redoubled their efforts into the investigation, and the defendant continued to manipulate the system to protect Bulger, Flemmi, and himself. However, in 1990, after the defendant had retired from the FBI, Bulger and Flemmi became the subjects of a federal grand jury investigation. The defendant, who had maintained his relationship with other FBI agents, kept Bulger and Flemmi informed as to the progress being made in the FBI's investigation of Bulger and Flemmi, and, when the defendant learned Bulger and Flemmi were about to be indicted by the federal grand jury and arrested, he warned them. Bulger went into hiding, while Flemmi, who did not react quickly enough, was arrested.

After Flemmi was arrested, the defendant wrote a letter to the presiding federal judge in an effort to have Flemmi's case dismissed. Many of the statements

9

he made in this letter were false. The defendant also provided sensitive FBI information and documents to Flemmi's defense attorney, and he counseled Flemmi to falsely testify that the defendant's supervisor, Special Agent Morris, warned Bulger about the federal indictment rather than the defendant.[2] Ultimately, however, Flemmi and others agreed to cooperate with the FBI and other law enforcement agencies, and an amended indictment was filed in 1995 charging the defendant, along with the previously-charged co-defendants (Bulger, Flemmi, and Martorano), with Callahan's murder. The defendant was tried, and on November 6, 2008, the jury found the defendant guilty of the reclassified lesser included offense of second degree murder with a firearm.

## ISSUES RAISED ON APPEAL

### I. The indictment

The defendant argues that the indictment failed to provide him with sufficient notice that if he was convicted of a lesser included offense of first degree murder, the lesser included offense could be reclassified based on the defendant's personal possession of a firearm during the commission of the murder. However, because the defendant did not raise a challenge or an objection to the indictment or otherwise

---

[2] Morris and other FBI agents received money and gifts from Bulger and Flemmi while the defendant was still employed by the FBI. The defendant served as an intermediary to deliver the money and gifts to these agents. Morris, who testified at the defendant's trial, admitted that the defendant delivered money and gifts to him from Bulger and Flemmi.

challenge the reclassification before submitting the reclassification issue to the jury, the defendant has waived the right to contest that issue unless he can demonstrate fundamental error. Specifically, the defendant did not claim that the second degree murder could not be reclassified due to a defect in the indictment or based on the evidence presented until one month after the jury's verdict, and even then, he did not claim surprise or the lack of due process. Thus, he has failed to preserve any objection to the reclassification of his second degree murder conviction based on a defect in the indictment, and therefore, he must establish fundamental error on this claim to obtain a reversal.

The defendant cannot demonstrate fundamental error because possession of a firearm is not a necessary element of second degree murder; the indictment charges that the second degree murder was committed with a firearm; the indictment references section 775.087, the firearm reclassification/enhancement statute, in both the heading and in the body of the indictment; the State specifically informed the defendant that it intended to prove that he personally carried a firearm during the commission of the murder; the defendant has never claimed surprise or that he was prejudiced in the preparation or presentation of his defense by the reclassification of the homicide offense under section 775.087; and the reclassified second degree murder was not greater in degree or penalty than the charged first degree premeditated murder.

11

**A.** **The defendant failed to preserve the alleged defect in the indictment and therefore waived that issue.**

To preserve error for appellate review, a contemporaneous, specific objection must be made during trial. Jackson v. State, 983 So. 2d 562, 568 (Fla. 2008); Gore v. State, 964 So. 2d 1257, 1265 (Fla. 2007). The Florida Supreme Court has explained that "[t]his requirement is 'based on practical necessity and basic fairness in the operation of a judicial system.'" Insko v. State, 969 So. 2d 992, 1001 (Fla. 2007) (quoting Castor v. State, 365 So. 2d 701, 703 (Fla. 1978)).

At no time prior to the jury's verdict did the defendant raise a challenge or an objection to the reclassification of the murder charged in Count I based on the sufficiency of the indictment. He did not claim the indictment was imprecise, imperfect, or defective. At the charge conference, when the State sought reclassification of the homicide based on the defendant's personal possession of a firearm during the acts the defendant committed as a co-perpetrator (principal in the first degree) to the homicide, the defendant did not claim surprise, lack of due process, or that the second degree murder could not be reclassified due to a defect in the indictment. In fact, the first time the defendant challenged the sufficiency of the indictment to permit reclassification of the homicide was one month after the jury's verdict in his untimely filed motion for arrest of judgment, and even to this day, he has not claimed surprise or prejudice in the preparation of his defense. At the charge conference, the defendant generally objected to the jury being instructed on all of

12

the lesser included offenses of first degree premeditated murder because they were time-barred, but the defendant conceded that second degree murder with a firearm was not time-barred because it was a life felony, and he did not claim or argue that the second degree murder could not be reclassified based on a defect in the indictment.

The case law is clear: The failure to object to a technical deficiency in the charging document constitutes a waiver, and the time to raise a challenge to the charging document is prior to the jury's verdict so the deficiency can be cured, not after the verdict is rendered. State v. Burnette, 881 So. 2d 693, 693-94 (Fla. 1st DCA 2004). Additionally, the specific argument or legal ground raised on appeal must have been raised and argued below. Bertolotti v. Dugger, 514 So. 2d 1095, 1096 (Fla. 1987) ("[T]o preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court."); see also Tolbert v. State, 679 So. 2d 816, 818 (Fla. 4th DCA 1996) (en banc) (finding that, although a necessary element of the lesser included offense was not alleged in the information, the defendant's objections were not specific enough to preserve the issue for appellate review); Wilson v. State, 383 So. 2d 670, 671 (Fla. 5th DCA 1980) (finding that the defendant cannot claim error on appeal where he did not assert the State's failure to allege the necessary elements of a permissive lesser included offense as a ground for his objection).

A general objection to all lesser included offenses, the same objection made by the defendant in the instant case, has been found by Florida courts to be insufficient to apprise the trial court of the specific reason for the defendant's objection. For example, in Tolbert, 679 So. 2d at 818, the Fourth District Court of Appeal, sitting en banc, declined to address the defendant's claim on appeal that the charging document did not sufficiently allege the elements of the lesser included offense for which the defendant was convicted because the defendant failed to raise this specific ground before the trial court. Specifically, the Fourth District stated:

> We agree with the state that this issue was not preserved for appeal because appellant's general objections to instructions on any lesser included offenses did not apprise the trial court of the ground now relied upon by the appellant, i.e., that an element of aggravated battery was not alleged in the information. It is well settled that in order to preserve an issue for appellate review, the specific legal ground or argument relied upon for appeal must have been presented to the trial court.

Id.

Similarly, in Courson v. State, 414 So. 2d 207, 209 (Fla. 3d DCA 1982), this Court found that Courson's objection to all lesser included offenses was not sufficient to put the trial court on notice of his specific objection. This Court held that "a defendant must state distinctly the matter to which he objects and the grounds of his objection" to preserve his objection for appellate review. Id.

In the instant case, the defendant generally objected to all lesser included offenses. The only specific objection he made to the lesser included offenses of first

degree murder was that they were time-barred. The defendant therefore failed to preserve the specific ground upon which his appeal is now based—that second degree murder could not be reclassified to the non-time-barred offense of second degree murder with a firearm based on a deficiency in the charging document. Thus, any defect or deficiency as to Count I in the indictment was waived, unless the defendant can demonstrate fundamental error.

**B. <u>The alleged defect in the charging document does not constitute fundamental error.</u>**

Because the defendant did not object to the reclassification of second degree murder under section 775.087(1) based on a deficiency in the indictment, he must demonstrate that fundamental error occurred. See <u>Jackson</u>, 983 So. 2d at 568 ("Errors that have not been preserved by contemporaneous objection can be considered on direct appeal only if the error is fundamental." (citing <u>Goodwin v. State</u>, 751 So. 2d 537, 544 (Fla. 1999))); <u>see also</u> § 924.051(3), Fla. Stat. (2008) ("An appeal may not be taken from a judgment or order of a trial court unless a prejudicial error is alleged and is properly preserved or, if not properly preserved, would constitute fundamental error.").

A review of the indictment, the case law, and the record demonstrates that Count I was not fundamentally defective because: (1) the indictment did not omit an essential element of the charged offense; (2) the indictment referenced section 775.087 in the heading and the body of the charges; (3) the defendant had notice that

15

the State would be seeking a reclassification of his conviction under section 775.087 based on the defendant's personal possession of a firearm during the commission of the homicide; (4) at no time during the years of postconviction litigation has the defendant claimed surprise or prejudice in the preparation or presentation of his defense; and (5) the reclassified second degree murder was not greater in degree or penalty than the charged first degree murder.

(1) *Count I of the indictment did not omit an essential element of the crime.*

Under Florida law, technical defects in a charging document are treated differently than the failure to allege an essential element of the crime. An indictment that wholly omits an essential element of a crime is a fundamental defect that may be raised at any time because the indictment fails to charge a crime when an essential element is omitted. State v. Gray, 435 So. 2d 816, 818 (Fla. 1983). Use or possession of a firearm, however, is not an essential element of second degree murder,[3] but rather, it may serve to allow for a reclassification of the second degree murder from a first degree felony to a life felony or as an enhancement of the sentence imposed. See § 775.087.

Because the defect was not the omission of an essential element of the crime,

---

[3] The elements of second degree murder are: (1) the victim is dead; (2) the death was caused by the criminal act of the defendant; and (3) there was an unlawful killing of the victim "by any act imminently dangerous to another and evincing a depraved mind regardless of human life . . . ." § 782.04(2), Fla. Stat. (1981).

16

the defect is fundamental only if the defendant demonstrates that he was denied due process. In other words, because the defendant did not specifically and timely object to reclassification based on a defect in the indictment, and the defect was not the omission of an essential element, he has waived the defect unless he can demonstrate that he had no notice that a conviction for second degree murder could subject him to a reclassification under section 775.087(1) if the jury found he carried a firearm during the commission of the felony. See Delgado v. State, 43 So. 3d 132, 133 (Fla. 3d DCA 2010) ("An information is fundamentally defective only where it totally omits an essential element of the crime or is so vague, indistinct or indefinite that the defendant is misled or exposed to double jeopardy."); State v. Wimberly, 459 So. 2d 456, 458-59 (Fla. 5th DCA 1984) ("There is a difference between an information that completely fails to charge a crime and one where the charging allegations are incomplete or imprecise. The former is fundamentally defective. However, where the information is merely imperfect or imprecise, the failure to timely file a motion to dismiss under Rule 3.190(c) waives the defect and it cannot be raised for the first time on appeal. . . . If the information recites the appropriate statute alleged to be violated, and if the statute clearly includes the omitted words, it cannot be said that the imperfection of the information prejudiced the defendant in his defenses." (citations omitted) (quoting Jones v. State 415 So. 2d 852, 853 (Fla. 5th DCA 1982))); Brewer v. State, 413 So. 2d 1217, 1221 (Fla. 5th DCA 1982) (en

17

banc) (finding no fundamental error where the deficiency of the charging document was not a total omission of an essential element of the crime); Kane v. State, 392 So. 2d 1012, 1013 (Fla. 5th DCA 1981) (same); State v. Cadieu, 353 So. 2d 150, 151 (Fla. 1st DCA 1977) ("The law does not favor a strategy of withholding attack on the information until the defendant is in jeopardy, then moving to bar the prosecution entirely.").

In the instant case, it is undisputed that the indictment properly charged all of the elements of second degree murder, and, as will be discussed in the following sections, the indictment did not mislead the defendant because he had notice that a conviction as to Count I could subject him to a reclassification of the offense based on his personal possession of a firearm during the commission of the offense.

(2) *There was no fundamental error because the indictment referenced section 775.087 in the heading and the body of the charge.*

In Mesa v. State, this Court, relying on binding Florida Supreme Court precedent, noted that even where the charging document fails to include an essential element of a crime, the defendant's failure to file a pretrial motion to dismiss the indictment or information constitutes a waiver if the charging document references the specific criminal code the defendant is charged with violating. 632 So. 2d 1094, 1097-98 (Fla. 3d DCA 1994) (citing DuBoise v. State, 520 So. 2d 260, 265 (Fla. 1988)). Applying this standard, this Court held that where the information charging Mesa with attempted second degree murder failed to allege that Mesa possessed a

18

firearm during the commission of the felony, **the information was not fundamentally defective because it referenced section 775.087 as one of the statutes the defendant had allegedly violated**; the jury found the defendant guilty of possessing a firearm during the commission of the offense; and there was competent evidence to support the jury's finding. Id. at 1097-98; see also Baker v. State, 4 So. 3d 758, 760-61 (Fla. 1st DCA 2009) (holding that the defendant must establish fundamental error because he did not raise an objection to a defect in the information prior to trial and noting that, even where the charging document omits an essential element of the crime, the charging document may still withstand challenge if it references the specific section of the code that details the elements of the offense).

In the instant case, section 775.087 was referenced in both the heading and the body of Count I of the indictment; the jury found the defendant guilty of carrying a firearm during the commission of the homicide; and there was competent evidence to support the jury's finding. Thus, no fundamental error has been demonstrated.

(3) *There was no fundamental error because the defendant has not claimed or demonstrated prejudice.*

"'The test for granting relief based upon a defect in the charging document is actual prejudice.'" Delgado, 43 So. 3d at 133 (quoting Gray, 435 So. 2d at 818). In the instant case, no actual prejudice has been alleged or shown. The defendant has never claimed surprise or prejudice in the preparation or presentation of his defense.

19

He did not claim surprise, lack of notice, or prejudice at the charge conference when the State requested that the jury be instructed on the firearm reclassification of second degree murder, and he has not asserted that he was surprised or prejudiced in his post-trial motions, appellate briefs, or arguments before this Court.

The record sheds light on why no such claim has been made by the defendant. First, on February 15, 2006, two and a half years prior to trial, the defendant filed and litigated a motion to dismiss Count II, the conspiracy charge, on the basis that the statute of limitations had run on that count prior to the filing of the indictment. In his motion, the defendant argued that conspiracy to commit murder was subject to a four-year statute of limitations, and **even if this limitations period could be extended for the homicide if the defendant committed the homicide with a firearm, the State would also be required to prove that the defendant was armed with a firearm at the time he conspired with others to commit the homicide in order to permit reclassification of the conspiracy.** This argument clearly shows that the defendant recognized the potential for reclassification upon a conviction of the homicide.

In its response to the defendant's motion to dismiss the conspiracy count, the State readily acknowledged that the jury must find that the defendant actually carried a firearm during the charged offense in order for the defendant to be subject to reclassification under section 775.087(1) and that, although one of the co-defendants

20

actually shot the victim, the defendant could also be eligible for reclassification based on his own personal possession of a firearm during his actions giving rise to liability for the offense. The State explained that section 775.087(1) provides for the reclassification of a first degree felony to a life felony if the defendant **"carried"** **"any"** (emphasis in the original) weapon during the commission of the felony. The State not only bolded and underlined "carried" and "any," the State also specifically told the defendant in its response that it intended to prove at trial that the defendant **carried** a firearm within the meaning of section 775.087(1) during the relevant time periods alleged in the indictment.

Additionally, the trial court's order denying the defendant's motion to dismiss Count II put the defendant on notice that a conviction in Count I could also result in a reclassification of that offense. The trial court's order specifically found that a first degree felony could be reclassified to a life felony under section 775.087(1), and there is no statute of limitations for a life felony. The trial court's order also put the defendant on notice that the State intended to seek a reclassification of the conspiracy to commit first degree murder charge because (1) conspiracy was designated as a life felony in the caption of the indictment; (2) section 775.087 was referenced in the heading of the indictment and in the body of each count of the indictment; and (3) the State alleged in the body of the conspiracy count that the conspiracy was committed with a firearm. Although the defendant's motion and the State's response

21

were directed to the conspiracy charge, these pleadings and the trial court's order put the defendant on notice that Count I could also be reclassified because the indictment also referenced section 775.087 in the heading and in the body of the murder charge in Count I, and it also alleged that the homicide was committed with a firearm.

Additionally, because first degree murder cannot be further enhanced or reclassified, the only purpose in referencing section 775.087 in the heading and in the body of Count I was to put the defendant on notice that a conviction for a lesser included offense in that count could subject him to an enhancement and/or a reclassification of the lesser offense. Second degree murder is a **necessary** lesser included offense of first degree premeditated murder, see State v. Montgomery, 39 So. 3d 252, 259 n.4 (Fla. 2010) (citing Fla. Std. Jury Instr. (Crim.) 7.2), and second degree murder with a firearm is not barred by the statute of limitations because it is a life felony. § 775.15(1), Fla. Stat. (1981).

It is well-established Florida law that a lesser included offense of the crime alleged in the charging document can be reclassified under section 775.087(1). See Miller v. State, 460 So. 2d 373, 374 (Fla. 1984). The defendant was therefore put on notice that section 775.087(1) could be used to reclassify second degree murder to a life felony if the State proved and the jury found that the defendant carried, displayed, used, threatened, or attempted to use a firearm during

22

the commission of the homicide.  Because second degree murder is a **necessary** lesser included offense of first degree premeditated murder, and second degree murder with a firearm was not barred by the statute of limitations, the defendant was on notice that the jury would be charged with considering second degree murder as a lesser included offense.  Thus, the indictment was not fundamentally defective.

(4) *There was no fundamental error because the reclassified second degree murder was not greater in degree or penalty than the charged first degree murder.*

In <u>Ray v. State</u>, the Florida Supreme Court cautioned the appellate courts to exercise their discretion concerning fundamental error "'very guardedly,'" 403 So. 2d 956, 960 (Fla. 1981) (quoting <u>Sanford v. Rubin</u>, 237 So. 2d 134, 137 (Fla. 1970)), and "only in the rare cases where jurisdictional error appears or where the interests of justice present a compelling demand for its application," <u>id.</u>  The Court also noted that "[t]he failure to object is a strong indication that, at the time and under the circumstances, the defendant did not regard the alleged fundamental error as harmful or prejudicial." <u>Id.</u>  Further, the <u>Ray</u> Court stated:  "'It is well-established law that where the trial judge has extended counsel an opportunity to cure any error, and counsel fails to take advantage of the opportunity, such error, if any, was invited and will not warrant reversal.'" <u>Id.</u> (quoting <u>Sullivan v. State</u>, 303 So. 2d 632, 635 (Fla. 1974)).  Additionally, where defense counsel fails to object to an improper instruction or where he takes affirmative action, such as requesting the improper

23

instruction, he waives any defects. Id. at 961.

Applying these principles in Ray, the Florida Supreme Court held that it was not fundamental error to convict the defendant of an erroneous lesser included offense when the defendant failed to object if: (1) the offense is lesser in degree and penalty than the main offense, or (2) defense counsel requested or relied on the charge or took other affirmative action. Id. **"Failure to timely object precludes relief from such a conviction."** Id. (emphasis added).

Relying on Ray, this Court concluded in Mitchell v. State, 689 So. 2d 1118, 1120 (Fla. 3d DCA 1997), that no fundamental error had occurred in the reclassification of Mitchell's manslaughter conviction from a second degree felony to a first degree felony under section 775.087(1), the weapon reclassification statute, where Mitchell did not object to the jury instructions or verdict form, the jury found the offense was committed with a firearm, and Mitchell was not convicted of an offense greater in degree or penalty than the charged offense. See also Diaz-Gonzalez v. State, 932 So. 2d 528, 529-30 (Fla. 3d DCA 2006) (citing Ray and declining to address on appeal the alleged defect in the charging document where the defendant failed to raise the issue at trial).

In the instant case, although the defendant had ample time to object to the indictment and to the reclassification of the lesser included offense of second degree murder under section 775.087(1) before trial and at the charge conference before the

24

jury was instructed, he failed to do so.[4]  Although defense counsel objected to the

trial court instructing the jury on any lesser included offenses because they were

barred by the statute of limitations, he **conceded** that second degree murder with a

firearm was not similarly barred, and he never argued that the State could not seek

reclassification of the second degree murder under section 775.087(1) because the

firearm reclassification was not properly charged in the indictment.  Instead, **defense**

**counsel affirmatively requested** the trial court **to include the firearm**

**reclassification as a necessary element of second degree murder when charging**

**the jury** because second degree murder with a firearm was the only lesser included

---

[4] While the defendant objected at the charge conference to the trial court instructing
the jury on conspiracy with a firearm (Count II), he specifically limited his objection
regarding reclassification under section 775.087(1) to the conspiracy count:

> **Defense Counsel**:  I object to the instruction with a firearm because it
> is not charged in the indictment.  This goes back to an argument that
> was made a while ago with regard to our motion to dismiss because the
> statute of limitations has run.  If we look at Count 2.
> **The State**:  Count 1 or 2?
> **Defense Counsel**:  If we look at Count 2, what is charged is a
> conspiracy to commit the crime of first degree murder with a firearm.
> What should be charged is armed conspiracy to commit first degree
> murder with a firearm and the way it is charged it is not the substantive
> charge of conspiracy is not charged with a firearm [sic].  Therefore, I
> object to this instruction and renew my motion to dismiss Count 2
> because the statute of limitations has run.

The defendant's only objection to Count I, the homicide count, was his
objection to second degree murder as a lesser induced offense because second degree
murder was time barred.

25

offense of first degree murder that was not time barred. The State agreed, and the jury was instructed as the defendant requested. Thus, the jury was instructed that the lesser included offense of first degree premeditated murder was second degree murder with a firearm, and the jury instruction included **four** elements: the three statutory elements for second degree murder **and** the possession of a firearm, all of which the State was required to prove beyond a reasonable doubt.

The defendant did not demonstrate fundamental error because he did not object to the reclassification of the second degree murder under section 775.087(1); he took affirmative action by requesting that the reclassification be made an element of second degree murder; there was abundant evidence that the defendant carried a firearm during the commission of the murder; and second degree murder with a firearm is an offense lesser in degree and penalty than first degree premeditated murder.

## II. **The jury's verdict**

The defendant's second contention is that the jury's verdict was insufficient to subject him to reclassification under section 775.087(1). While the defendant is correct that it is generally advisable for the trial court to instruct the jury to indicate whether the defendant was armed with a firearm during the commission of the offense via a special interrogatory, no special interrogatory was requested by the defendant. Further, a special interrogatory was not required in this case because,

based on the defendant's specific request, the firearm reclassification was included as an essential element of second degree murder in both the jury instructions and the verdict form.

Specifically, the jury was instructed that the only lesser included offense of first degree premeditated murder it could consider was second degree murder **with a firearm**, not simply second degree murder. The jury was also instructed that before it could find the defendant guilty of second degree murder with a firearm, as a lesser included offense of first degree murder, they must find beyond a reasonable doubt that the **defendant personally carried a firearm during the commission of the murder**. Specifically, the jury was instructed as follows:

> To prove the crime of **Second Degree Murder, with a Firearm**, as a lesser included offense the State must prove the following four elements beyond a reasonable doubt:
>
> 1. JOHN CALLAHAN is dead.
> 2. The death was **caused by the criminal act of JOHN J. CONNOLLY, JR.**
> 3. There was an unlawful killing of JOHN CALLAHAN by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.
> 4. During the **"act" the defendant John Connolly carried a firearm**.
>
> An "act" includes a series of related actions arising from and performed pursuant to a single design or purpose.
>
> An act is "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that:
> 1. a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and

27

> 2. is done from ill will, hatred, spite or an evil intent, and
> 3. is of such a nature that the act itself indicates an indifference to human life.
>
> In order to convict of Second Degree Murder with a Firearm, it is not necessary for the State to prove the defendant had an intent to cause death.

(emphasis added).

The State also clarified its theory of prosecution, the trial court's instructions, and the verdict form in its closing arguments. The State explained to the jury, **without any objection by the defendant**, that there was no dispute that the defendant was not physically present when Martorano killed Callahan, but that the defendant need not be present when the killing took place so long as the defendant committed some act or said some word which was intended to incite, cause, encourage, assist, or advise the other person or persons who actually committed the murder under the law regarding principals and accomplices.

The State then explained that there were two relevant guns in this case: the gun Martorano used to actually shoot and kill Callahan and the gun carried by the defendant when he committed the acts that made him a principal to the murder. The State specifically went over the jury instructions for second degree murder and the evidence that had been presented regarding the defendant's possession of a firearm during his role in Callahan's murder.

The State also told the jurors that before they could find the defendant guilty

28

of second degree murder with a firearm, as a lesser included offense of first degree premeditated murder, the State had to prove **four** elements beyond a reasonable doubt. When addressing the fourth element, that during the "act" the defendant carried a firearm, the State explained:

> And the fourth, which is a unique act element, which applies to this and the criminal conspiracy as well, is that **during the act the defendant, John Connolly, carried a firearm**.
>
> Now what does that mean? It does not mean that John Connolly had to have a gun and shoot Callahan. **It meant and it means that during the time John Connolly is advising, discussing, assisting and conspiring with Flemmi, Bulger and ultimately Martorano that he had a gun.**
>
> And how do you know he had a gun? Because he's an FBI agent, and all the witnesses told you that as an FBI agent he's required to carry his gun.
>
> **He carried his gun. He had his gun. Flemmi saw it when they met.** And if you--when he's meeting with his informants every agent says, you don't meet with an informant without a gun.
>
> And he's an FBI agent. And, you know, he was carrying his gun. He doesn't have to have used his own gun, just had to have had it at the time he's discussing it with them.
>
> And the act includes a series of related actions arising from and performed pursuant to a single design or purpose. And in this case, it's the murder of John Callahan.

(emphasis added).

Lastly, the verdict form specifically required the jury to find that the defendant personally carried a firearm during the acts he committed which caused the death of

29

Callahan in order to convict the defendant of second degree murder with a firearm. Notably, while the firearm language was not included in the verdict form for first degree murder, it **was** included in the verdict form for second degree murder with a firearm.

### VERDICT-COUNT I

We the jury, in Miami-Dade County, Florida, this  6  day of NOVEMBER, 2008, find the defendant, JOHN J. CONNOLLY, JR.,

**COUNT 1 (check only one):**

☐ GUILTY of FIRST DEGREE MURDER AS CHARGED IN COUNT 1 OF THE INDICTMENT.

☑ GUILTY of SECOND DEGREE MURDER, WITH A FIREARM, AS A LESSER-INCLUDED OFFENSE OF FIRST DEGREE MURDER.

☐ NOT GUILTY

Because the firearm reclassification was treated as an element of second degree murder, and based on the State's arguments to the jury, the trial court's instructions to the jury that it must find that the defendant carried a firearm during the acts he committed as a principal to Callahan's murder as a necessary element of second degree murder with a firearm, and the jury's verdict reflecting that the State proved the firearm element beyond a reasonable doubt, the jury's verdict sufficiently supports the firearm reclassification of the second degree murder.

30

**III. The reclassification of second degree murder was based on the defendant's personal possession of a firearm, not on a co-defendant's use of a firearm during the commission of the homicide**

We agree with the defendant that his conviction for second degree murder could not be reclassified under section 775.087(1) based on a co-defendant's possession or use of a weapon or firearm during the commission of the murder. The dissent's assertion that we conclude otherwise is therefore misplaced. Florida law is well-settled that section 775.087(1) does not permit vicarious enhancement. See State v. Rodriguez, 602 So. 2d 1270, 1271 (Fla. 1992) (holding that "section 775.087(1) does not, by its terms, allow for vicarious enhancement because of the action of a codefendant"); Chase v. State, 74 So. 3d 1138, 1139 (Fla. 2d DCA 2011) (reversing the reclassification of the defendant's conviction for aggravated battery where there was no evidence that the defendant possessed or used a weapon during the commission of the offense); Campbell v. State, 935 So. 2d 614, 618 (Fla. 3d DCA 2006) (finding that it was error to reclassify Campbell's conviction for conspiracy to traffic in cocaine under section 775.087(1) where there was no evidence that Campbell had actual physical or personal possession of a weapon at any time during the conspiracy); Parker v. State, 906 So. 2d 1273, 1273 (Fla. 5th DCA 2005) (noting that enhancement under section 775.087(1) is impermissible unless the defendant actually possesses a weapon during the commission of a crime); Betancourt v. State, 767 So. 2d 557, 557 n.1 (Fla. 3d DCA

31

2000) (noting that the State properly conceded below that the reclassification of the kidnapping conviction was error where the co-defendant, not the defendant, possessed the firearm).

We fully agree that the defendant's conviction could not have been reclassified due to Martorano's use of a firearm. However, the defendant's second degree murder conviction in the instant case was **not** reclassified based Martorano's possession or use of a firearm during the commission of the murder. Rather, the reclassification was based solely on the defendant's own actual and personal possession of a totally separate firearm during his involvement in the commission of the homicide.

The defendant was convicted as a principal of the second degree murder of Callahan, see § 777.011, Fla. Stat. (2005) [5] (making those who actually commit or aid, abet, or procure the commission of a felony principals in the first degree), and the jury found that the defendant was personally armed with a firearm during the commission of the second degree murder. There was ample evidence at trial to support this finding as several witnesses testified that the defendant had a firearm at all the meetings where he met with Bulger and Flemmi. Thus, there was no vicarious enhancement, only a proper reclassification based on the defendant's personal

---

[5] Although the murder occurred in 1982, we cite to section 777.011, Fla. Stat. (2005), as that is the principal instruction that was agreed to by the parties and instructed by the trial court.

32

possession of a firearm.

## IV. Reclassification under section 775.087(1) does not require possession of the murder weapon

Section 775.087(1) does not require, as the dissent claims, the defendant's use or possession of the actual murder weapon. Rather, section 775.087(1) allows for reclassification of an offense if the defendant carries **any** weapon or firearm at any time during the commission of the felony.

The dissent's position to the contrary is based on its misreading of Rodriguez. In Rodriguez, the Florida Supreme Court once again addressed the impropriety of vicarious enhancement or reclassification—as we recognized above—and reiterated that a defendant's sentence may not be enhanced based on a co-defendant's possession of a weapon: "We have jurisdiction and answer the question in the negative, finding in accordance with the district court decision, that section 775.087(1) does not, by its terms, allow for vicarious enhancement because of the action of a codefendant." 602 So. 2d at 1271 (footnote omitted). The Florida Supreme Court further held that because the defendant was charged with **use** of the weapon during the commission of the felony and the State did not prove that Rodriguez had personal possession of the weapon used during the commission of the offense, enhancement was improper. Id. at 1272. Importantly, however, the Florida Supreme Court noted that "**Rodriguez's sentence could have been enhanced under the statute if the State had charged him with the commission**

33

**of a felony while *carrying* the pistol that was found on his person after the chase**." Id. (emphasis added).

Thus, contrary to the dissent, a defendant's sentence may be enhanced or reclassified if the defendant carried any firearm during the commission of the homicide. The law does not require that the defendant be the actual shooter. Indeed, such a holding would entirely negate all the language in section 775.087 except for "use" of a weapon. Thus, if two men enter a business with the intent to rob and murder the owner, and both are armed with firearms, the State may seek reclassification of both perpetrators' convictions based on their respective possession of a firearm, even if only one of the perpetrators shoots and kills the victim. Reclassification of the shooter's convictions would be based on his possession and use of the murder weapon, while the reclassification of the co-perpetrator's convictions would be based on his possession of a second firearm during the commission of the offense even though he only "carried" and did not use or threaten the victim with his firearm. See Andrade v. State, 564 So. 2d 238, 239 (Fla. 3d DCA 1990) (finding no error in enhancement of Andrade's convictions for three counts of attempted murder and the imposition of three-year minimum mandatory sentences as to each conviction where there was evidence that established that Andrade possessed a firearm during the criminal episode); Junco v. State, 510 So. 2d 909, 913 (Fla. 3d DCA 1987) (affirming Junco's and his co-defendant's

34

convictions for second degree murder with a firearm, attempted second degree murder, robbery with a firearm, trafficking in cannabis, and the enhancement of their sentences where it was established that each possessed a firearm when participating in the criminal offense).

In this case, during the commission of the homicide the defendant committed acts as a principal in the first degree, and while committing these acts, he indisputably carried a firearm. Thus, section 775.087(1) was correctly applied to reclassify the offense.

Section 775.087(1) provides in relevant part as follows:

(1) Unless otherwise provided by law, whenever a person is charged with a felony, except a felony in which the use of a weapon or firearm is an essential element, and during the commission of such felony the defendant **carries**, displays, uses, threatens to use, or attempts to use **any weapon or firearm**, or during the commission of such felony the defendant commits an aggravated battery, the felony for which the person is charged shall be reclassified . . . .

(emphasis added).

The statute is clear and unambiguous. "Use" of "the" firearm (or weapon) during the commission of the felony is simply not required, and the dissent's narrow reading of the reclassification statute has no basis in Florida law. It is merely one of many options from which the State can choose to reclassify an offense. Here, the jury found that the defendant carried a firearm during the acts he committed during the commission of, and which subjected him to his conviction for, the second degree

35

murder.  If a defendant "carries" "any" weapon during the commission of the felony, section 775.087(1) is applicable.

**V.  <u>Florida law does not treat actual perpetrators and aiders and abettors differently, and application of section 775.087(1) does not rely on the role each plays during the commission of the offense</u>**

Under Florida law, those who actually commit the offense and those who aid, abet, or procure the commission of an offense are treated the same regardless of their role in the commission of the offense or whether they are present at the scene during the final acts of the offense.  <u>State v. Dene</u>, 533 So. 2d 265, 266-69 (Fla. 1988); <u>Potts v. State</u>, 430 So. 2d 900, 901-02 (Fla. 1982).  In 1957, the Florida Legislature eliminated these distinctions.

Prior to 1957, Florida law provided different classifications for perpetrators depending on their level of participation in the offense.  Those who actually committed the offense were treated as principals in the first degree; those who were present when the crime was being committed and aided and abetted the commission of the crime were treated as principals in the second degree; those who were not present while the crime was being committed but procured, counseled, commanded, or abetted another to commit the crime were treated as accessories before the fact; and those who knew a felony had been committed and then assisted the felon afterward were treated as accessories after the fact.  <u>Potts</u>, 430 So. 2d at 901.

In 1957, the Florida Legislature retained the category of accessories after the

fact but eliminated the distinctions between principals in the first degree (the actual perpetrator), principals in the second degree, and accessories before the fact and now treats them the same, referring to perpetrators and accomplices alike as "**principal[s] in the first degree**." Ch. 57-310, §§ 1-2, at 608, Laws of Fla.; <u>Dene</u>, 533 So. 2d at 267 (concluding that "[t]he effect of this law was that the traditional definitions of principal in the first degree, principal in the second degree, and accessory before the fact were all combined within the statutory definition of **principal in the first degree**") (emphasis added).

Since 1957, actual perpetrators, as well as aiders and abettors, whether before or during the offense and whether present or not present at the scene, are all "principals in the first degree," and they are treated the same and are equally culpable under the law. <u>Staten</u>, 519 So. 2d at 624 (Fla. 1988); <u>see also</u> § 777.011, Fla. Stat. (2005) (renumbered in 1977 from section 776.011 to section 777.011). Section 777.011 provides as follows:

> Whoever **commits** any criminal offense against the state, whether felony or misdemeanor, **or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree** and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.

(emphasis added).

The Florida Legislature specifically stated the following in Chapter 57-310 of

37

the Laws of Florida when it abolished the distinctions between perpetrators (principals in the first degree), principals in the second degree, and accessories before the fact:

> WHEREAS, the legal distinctions between accessory before the fact, principal in the first degree and principal in the second degree serve no useful purpose; and

> WHEREAS, these distinctions serve only as technicalities which impede the orderly administration of justice for the benefit of those charged with crimes, and as such should be abolished . . . .

Ch. 57-310, at 608, Laws of Fla. And, as the Florida Supreme Court recognized in Dene, "The legislative intent could not have been clearer." 533 So. 2d at 266.

The dissent, however, takes the position that reclassification of the murder in this case under section 775.087(1) is only permissible for what it calls the "actual perpetrator," i.e., the person who shot the victim in the head. Thus, based on the dissent's position, even if another individual ("Perp. #2") held the victim at gunpoint while his accomplice ("Perp. #1") shot and killed the victim, only Perp. #1 would be subject to reclassification. The dissent's position is contrary to section 777.011 (the law of principals) and section 775.087(1) (the law regarding reclassification of offenses). Section 777.011 mandates that perpetrators and aiders and abettors are all "principals" and "may be charged, convicted and punished as such." Florida law does not identify some of the participants of the offense as "perpetrators" and others as "principals." They are all "principals" if they actually committed, aided, abetted,

counseled, hired, or procured such offense to be committed. And section 775.087(1) provides, in pertinent part that "Whenever **a person** is charged with a felony . . . and during the commission of such felony the defendant **carries**, displays, uses, threatens to use, or attempts to use **any weapon or firearm** . . . the felony for which the person is charged shall be classified as follows . . . ."

It now no longer matters whether the defendant hired (procured) a hit man, turned to his mob friends to murder Callahan, served as a lookout, provided the gun, or pulled the trigger himself, he is a principal in the first degree. See Staten. 519 So. 2d at 624 ("Under our law, both the actor and those who aid and abet in the commission of a crime are principals in the first degree. . . . Clearly, the getaway driver who has prior knowledge of the criminal plan and is 'waiting to help the robbers escape,' falls into this category and is, therefore, a principal." (footnote and citations omitted) (quoting Enmund v. State, 399 So. 2d 1362, 1370 (Fla. 1981), rev'd on other grounds, 458 U.S. 782 (1982))). As long as the State proves that the act the defendant committed was "imminently dangerous to another and evincing a depraved mind regardless of human life" and the act caused the victim's death, § 782.04(2), the defendant is guilty as a principal for the second degree murder of Callahan. And because the defendant was armed with a firearm when he committed these acts, reclassification under section 775.087(1) was lawful.

Thus, contrary to the dissent's position, for nearly sixty years, Florida has

treated the "actual perpetrator" and aiders and abettors the same regardless of their roles in the offense (they are all principals in the first degree), and section 775.087(1) provides for reclassification of the offense if during the commission of the offense the defendant carries, displays, etc. a firearm. Section 775.087(1) does not limit its application to "the actual perpetrator," nor would it make sense to do so since actual perpetrators and aiders and abettors are all "principal[s] in the first degree." § 777.011. As the Florida Legislature specifically noted, such distinctions "serve no useful purpose." Ch. 57-310, at 680, Laws of Fla.

## VI. <u>**Reclassification of the second degree murder was lawful because the State presented evidence and the jury found that the defendant personally carried a firearm during his role as a "principal in the first degree" to second degree murder**</u>

Lastly, the defendant suggests, and the dissenting opinion and the concurring in part and dissenting in part opinion (which for purposes of addressing this argument will be referred to collectively as "the dissenters") conclude that reclassification under section 775.087(1) may only occur if the firearm the defendant was carrying was both temporally and spatially related to the homicide. Thus, the dissenters contend that because the defendant was hundreds of miles away in Boston when the victim was shot in Miami, it was fundamental error to reclassify his second degree murder conviction. This argument is based, in part, on the premise that, unlike certain on-going or continuing offenses (such as conspiracy, theft, and trafficking), the homicide was committed only at the precise moment the trigger was

40

pulled. As will be discussed below, the Florida Legislature has not engrafted such a requirement into the reclassification statute; the death of the victim was the result of a series of acts, not the sole act of the shooter; the acts committed by the defendant were imminently dangerous demonstrating a depraved mind without regard for human life; these acts caused the victim's death; and during the acts committed by the defendant, the defendant was armed with (carried) a firearm. Thus, the defendant was properly convicted of second degree murder with a firearm, and reclassification of his murder conviction was not error, much less fundamental error.

### A. **"During the commission of" does not require spatial proximity**

The relevant language in section 775.087(1) provides that "whenever a person is charged with a felony . . . and **during the commission of** such felony the defendant carries, displays, uses, threatens to use, or attempts to use any weapon or firearm, . . . the felony for which the person is charged shall be reclassified." (emphasis added). The phrase "during the commission of" is not expressly defined in the statute, likely because these words need no further explanation when given their plain and ordinary meaning. See Daniels v. Fla. Dep't of Health, 898 So. 2d 61, 64 (Fla. 2005) (holding that if the language is plain and unambiguous it is unnecessary to resort to statutory construction).

The Merriam-Webster Dictionary defines "during" as "**at some time in the course of** (something)." (emphasis added). The evidence presented in this case

41

clearly established that the defendant carried a firearm "at some time in the course of" committing this second degree murder.

Second degree murder is the unlawful killing of the victim "by an act" that is "imminently dangerous to another and evincing a depraved mind regardless of human life . . . ." § 782.04(2), Fla. Stat. (1981). Florida's standard jury instruction on second degree murder defines an "act" as "a series of related actions arising from and performed pursuant to a single design or purpose." Fla. Std. Jury Instr. (Crim.) 7.4. The same instruction explains that:

> An act is "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that:
> 1. a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
> 2. is done from ill will, hatred, spite or an evil intent, and
> 3. is of such a nature that the act itself indicated an indifference to human life.
>
> In order to convict of Second Degree Murder, it is not necessary for the State to prove the defendant had an intent to cause death.

The jury found that the acts the defendant committed—counseling members of the Winter Hill Gang to "take care of" Callahan—were imminently dangerous to another evincing a depraved mind because the defendant knew that when he told Bulger and Flemmi that the FBI was trying to locate Callahan to obtain his cooperation and also told them to contact Martorano to "handle it," he was signing a death warrant for the murder of Callahan. When the defendant provided similar information to Bulger and Flemmi in the past, they murdered or procured the murder

42

of the cooperating witnesses. For example, when the defendant warned Bulger and Flemmi that Castucci was cooperating with the FBI, Bulger, Flemmi, and Martorano murdered Castucci. When the defendant warned Bulger and Flemmi that Halloran was cooperating with the FBI, Bulger, Flemmi, and other Winter Hill Gang members murdered Halloran. Thus, when the defendant told Bulger and Flemmi that the FBI was looking for Callahan and that he believed Callahan would likely cooperate with the FBI and implicate Bulger, Flemmi, and Martorano, the defendant knew the result: Callahan would be murdered.

This act was done from ill will and an evil intent, and indicated an indifference to human life. The defendant wanted to protect Bulger, Flemmi, Martorano, **and himself** from criminal prosecution. He believed that once the FBI located Callahan and implicated Callahan in Wheeler's murder, Callahan would cooperate with the FBI for a reduced sentence, and Callahan's cooperation would implicate Bulger, Flemmi, Martorano, and the defendant in the Wheeler murder and other killings. The defendant therefore knew that Callahan needed to be silenced, and the way in which Bulger, Flemmi, and Martorano would silence Callahan was in the same way they silenced Castucci, Wheeler, and Halloran—by murdering him.

The State also proved that during this act the defendant was armed with ("carried") a firearm. Thus, during the commission of the second degree murder (the unlawful killing of the victim by an act of the defendant that was imminently

43

dangerous to another demonstrating a depraved mind without regard for human life), the defendant carried a firearm and the defendant's conviction was lawfully reclassified pursuant to section 775.087(1).

The dissenters seek to engraft a requirement into the text of section 775.087(1) that is not present—that the carrying of the firearm must be "both temporally and spatially related to the crime committed." However, the wording of the statute itself and a comparison to similar legislation demonstrates that the Florida Legislature did not include such a requirement and it intended that the reach of section 775.087 be as broad as possible, but tempered by prosecutorial discretion.

The relevant language in section 775.087(1) provides that "whenever a person is charged with a felony . . . and **during the commission of such felony** the defendant carries, displays, uses, threatens to use or attempts to use any weapon or firearm . . . the felony for which the person is charged shall be reclassified." (emphasis added). Compare the emphasized language in 775.087(1) to a similar federal provision, 18 U.S.C. § 924(c)(1)(A), which provides that:

> "[A]ny person who, **during and in relation to any crime of violence or drug trafficking crime** . . . uses or carries a firearm, or who, **in furtherance of any such crime**, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime [be sentenced to a minimum mandatory sentence to run consecutive to the underlying sentence.]"

(emphasis added).

When comparing section 775.087 (under any of its subsections) to the Federal

44

Code, it becomes glaringly apparent that the reach of section 775.087 of the Florida Statutes is substantially broader than that of section 924(c)(1)(A) of the Federal Code because the word "during" (at some time in the course of) in the Florida statute contemplates only a temporal relationship to the underlying crime, whereas the terms "during and in relation to" and "in furtherance of" in the Federal Code necessarily require a substantial nexus between the weapon carried and the charged offense. See, e.g., U.S. v. Gonzalez, 528 F.3d 1207, 1212 (9th Cir. 2008) (concluding that under Federal law, the determination of whether the "'in furtherance' requirement is met is a 'fact-based inquiry into the nexus between possession of the firearm and the drug crime[,]' including such factors as 'proximity, accessibility and strategic location of the firearms in relation to the locus of drug activities'") (alteration in original) (quoting United States v. Hector, 474 F.3d 1150, 1156-57 (9th Cir. 2007))). United States v. Guidry, 456 F.3d 493, 508 (5th Cir. 2006) ("To be carried 'in relation to' an offense under this section, a gun must have 'some purpose or effect with respect to the crime of violence.'" (internal quotation marks omitted) (quoting United States v. Polk, 118 F.3d 286, 293 (5th Cir. 1997))). Florida's statute, section 775.087, however, does not include the "in relation to" or "in furtherance of" language contained in its federal counterpart. Unlike the Federal Code, Florida's statute does not require any "functional" or spatial nexus for the carried firearm as the dissenters assert, nor does it require any coincidence of

45

purpose with the underlying offense. It merely requires that the defendant carry a weapon during the commission of the felony, and in this case it was proven, and the jury found, that during the acts the defendant committed during the commission of the homicide, he carried a firearm.

We must assume that the Florida Legislature chose its words carefully when drafting section 775.087, and it clearly chose to use very broad language to encompass a wide variety of factual permutations. Not only does section 775.087(1) require reclassification when the weapon is utilized "during the commission of [the] felony," it also allows the offense to be reclassified if the defendant "carries, displays, uses, threatens to use, or attempts to use" any weapon during the commission of the felony. It is clear that the ambit of section 775.087 is to allow harsher sentencing for defendants who in any way associate with a weapon while engaging in felonies. Thus, any person who carries any weapon while engaged in a felony is subject to harsher sentencing under section 775.087.

### B. Section 775.087 does not require that a principal be present when the "last act" was committed

Besides attempting to add this "spatial and temporal proximity" language to section 775.087(1), which does not appear in the statute under any of its provisions, the dissenters conclude that second degree murder is a "discrete offense," and because the defendant was not present when the "last act" to the murder was committed (the shooting of the victim), his conviction for second degree murder

46

cannot be reclassified pursuant to section 775.087(1). This conclusion rests on the premises that: (1) application of section 775.087(1) differs between "actual perpetrators" and aiders and abettors; and (2) second degree murder is a "discrete offense" that is only committed upon the completion of the crime—in other words, when the victim was shot and he died—and the defendant must have been present and armed when this last act occurred.

The first premise is wrong because as previously explained, the Florida Legislature eliminated the disparate treatment between "actual perpetrators" and aiders and abettors nearly sixty years ago. Perpetrators, who were always statutorily referred to as "principals in the first degree," and aiders and abettors are now **all** "principal[s] in the first degree," and section 777.011 provides that each may be "charged, convicted, and punished" the same. Section 775.087(1) does not alter this general principal of law, and thus, all principals are treated alike. If a principal is armed during the commission of the felony, his offense may be reclassified under section 775.087(1) whether or not he is present. "Whoever commits any criminal offense against the state, . . . or aids, abets, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offenses." § 777.011.

The second premise is wrong because, while it is true that the offense committed by Bulger, Flemmi, Martorano, and the defendant did not become a second degree murder until the victim died, see § 782.042(2) (requiring that a human be "kill[ed]" before the defendant can be charged with second degree murder), a defendant need not be present at the scene ("spatial and temporal proximity") when the **last element** of the second degree murder occurred to permit reclassification of the murder for the defendant's possession of a firearm during the commission of the offense. The dissenters essentially argue that the defendant must carry a weapon during every element of a particular crime, but the word "during" contemplates the carrying of a weapon at any point (while committing any element) in the course of the offense.

The fallacy of this interpretation of "during the commission of" can easily be demonstrated in the following hypothetical. Defendants #1, #2, and #3 decide to murder the victim. Defendant #1's assigned role in the homicide is to pick up the victim at Miami International Airport and to deliver him to Defendant #2 at a warehouse in Hialeah. Because the victim weighs 265 pounds, is a reputed enforcer for the mob, and may not willingly get into Defendant #1's car, Defendant #1 arms himself with a firearm. Everything, however, goes smoothly, and Defendant #1, who is armed with a firearm, delivers the victim to Defendant #2, and Defendant #1 promptly leaves the warehouse and begins driving to Atlanta, Georgia, where he

lives.  While at the warehouse, Defendant #2 decides to extract information from the victim before shooting him and accordingly keeps the victim in the warehouse for two days where he tortures the victim.  Two days later, while Defendant #1 is in Atlanta, Defendant #2 finally shoots the victim, as planned, and calls Defendant #3 to dispose of the body.  Defendant #3 arrives shortly thereafter.  He too is armed with a firearm. Defendant #3 picks up the victim, who is still breathing; puts the victim in his car; places his revolver on the seat next to him as a precautionary measure; and dumps the victim in an isolated field.  The victim lingers for over twelve hours, but he eventually dies.

Under this scenario, if we applied the "last act" requirement as suggested by the dissenters, even though each of the defendants was armed during his role in the homicide, only Defendant #3, who committed the last act—dumping the victim's body at a deserted location where he could not seek help and where he ultimately died—would be subject to reclassification under section 775.087(1).  Although Defendant #2 shot the victim and both Defendants #1 and #3 were principals in the first degree to the murder, because neither Defendant #1 nor Defendant #2 was present during the last act that caused the victim's death, under the dissenters' interpretation of section 775.087(1), their offenses could not be reclassified even though each was armed with a firearm when they carried out their agreed-upon roles in the homicide.  What the dissenters fail to recognize is that all three perpetrators

49

were principals in the first degree to the homicide; section 777.011 requires that they all be treated the same ("may be charged, convicted, and punished as such"); and section 775.087(1) permits reclassification of each of the principal's convictions if he personally used, threatened to use, carried, etc. a weapon during his participation in the commission of the felony.

The dissenters' "last act" argument is also defeated by the very language chosen by the Florida Legislature when drafting the statutes defining second degree murder and principals. The statutes establishing the elements of second degree murder and the law governing principals and accomplices specifically contemplate that the acts committed by a co-defendant during the commission of the felony may be committed at any time and any place. Neither section 777.011, the statute pertaining to principals, nor section 782.04(2), the statute pertaining to second degree murder, requires that the defendant be present or that he commit the **last act** that led to the victim's demise.

Section 777.011, the principal statute, holds the defendant legally responsible as a principal, whether or not he is present when the crime is committed, if he "**did some act**"—not the last act—"or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime." See also State v. Dene, 533 So. at 270 (holding that, pursuant to section 777.011, a principal does not have to be at the

50

scene of the crime); State v. Lowery, 419 So. 2d 621, 623-24 (Fla. 1982) (holding that Lowery was as equally culpable as a principal under section 777.011, as his co-felon who actually did the killing, although he was not present when his co-felon murdered the victim).

Similarly, for the defendant to be properly convicted of second degree murder, the State was required to prove that the victim's death was caused by **any criminal act** of the defendant that was imminently dangerous to another and demonstrated a depraved mind without regard for human life, not the last act. The jury instructions on second degree murder further explain that:

> An "act" includes a series of related actions arising from and performed pursuant to a single design or purpose.
> An act is "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that:
> (1)    a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and
> (2)    Is done from ill will, hatred, spite or evil intent, and
> (3)    Is of such a nature that the act itself indicates an indifference to human life.

The defendant does not dispute that there was competent substantial evidence to support his conviction for second degree murder. It is equally clear that neither section 777.011 nor section 782.04(2) requires the defendant to be present when the shooting occurs or during the "last act" that caused the victim's demise. The defendant and the dissenters, however, would impose such a requirement for reclassification under section 775.087(1) despite the Legislature's failure to add such

51

language to section 775.087(1).

## C. **Second degree murder can be an on-going crime**

Despite the Florida Legislature's failure to include a "last act" requirement for imposition of section 775.087(1), the defendant and the dissenters encourage this Court to judicially impose a "last act" requirement for the crime of second degree murder. In doing so, they attempt to distinguish the crime of second degree murder from other crimes where there is case law specifically upholding the reclassification of the offense. They argue that while some crimes may be "continuing crimes," second degree murder can **never** be a continuing crime; and unless the crime is a continuing crime, the defendant must be present when the last act was committed to have his sentence reclassified. The dissenters therefore conclude that because the acts the defendant committed occurred prior to the actual shooting—the last act that caused Callahan's death—his conviction for second degree murder could not be reclassified even though he was armed with a firearm when he committed those acts. We disagree. As we have already shown, there is no requirement under Florida law that the defendant commit the last act that caused the victim's death, that he be present during this last act, or that he possessed the weapon used during the last act that caused the victim's death for his murder conviction to be reclassified. And there are numerous scenarios where second degree murder may be an on-going crime.

This Court's opinion in <u>Junco v. State</u>, 510 So. 2d 909 (Fla. 3d DCA 1987),

which is in fact a second degree murder and attempted second degree murder case, clearly illustrates this point. In <u>Junco</u>, this Court affirmed the enhancement of Junco's robbery conviction and the imposition of consecutive three-year minimum mandatory sentences for his possession of a firearm during the commission of the second degree murder of two warehouse guards and the attempted second degree murder of another man even though Junco was not the shooter and was not present when the two guards were shot and killed and the third man was shot and injured. <u>Id.</u> This Court found that enhancement of the two second degree murders and the attempted second degree murder sentences pursuant to section 775.087 was proper, even though Junco was not present when the actual homicides and the attempted homicide were committed, because there was evidence that Junco was a principal to these offenses and he was in possession of a firearm while aiding and abetting the commission of the crimes. <u>Id.</u> This Court reached the same conclusion for Junco's co-defendant, R. Esquivel, who also did not shoot any of the victims but was armed with a firearm during the commission of the offenses. <u>Id.</u> at 911-13.

The fallacy of the dissenters' "last act" argument and their conclusion that second degree murder can never be an on-going or a continuing crime can also be illustrated by applying common logic. Consider the following two hypotheticals. In the first hypothetical, a homicide was committed by poisoning the victim. The victim's husband and son decide to murder the victim, and the husband begins lacing

the victim's food with a deadly poison. While the husband is out of town on a business trip, the son uses the last of the poison they were feeding the victim, so the son obtains another bottle of the lethal substance, and, after the son administers two more doses from the bottle he obtained, the victim finally dies. It is undisputed that the husband was not present when the son administered the last dose of poison from the bottle he obtained. Although the weapon (poison) used by the son during the "last act" was not the same weapon used by the husband, it seems clear that both are criminally liable for the murder and that each was armed with a weapon (the poison) during the acts they committed that were imminently dangerous to another and evincing a depraved mind without regard for human life. Clearly both are guilty of at least second degree murder with a weapon. The dissenters' rationale would not allow the husband's sentence to be reclassified because he was not present and did not administer the last dose of poison to the victim, while the son's conviction could be reclassified—an absurd result. This hypothetical also illustrates how, under certain circumstances, a homicide may be a continuing or an on-going offense. The victim did not die from the doses of poison from the first bottle. She died from the accumulation of the doses administered over time, and, while she did not die until the last dose of poison was administered, each act of poisoning was an act imminently dangerous to the victim without regard for human life, and these acts caused her death. During each act of poisoning, a principal to the murder was armed

54

with a deadly weapon.

In the second hypothetical, Bob the Burglar and Security Sam have a long-standing relationship whereby Sam, using his contacts and the information he obtained by working as a security guard, provides Bob the Burglar with confidential information regarding homes to burglarize. Over the course of this relationship, Bob the Burglar has, on occasion, been confronted by a homeowner or a security guard during the burglary, and during such confrontations, he has killed the occupant. The "job" that results in their undoing is a home on E-Z Street. Sam tells Bob that there is a large quantity of cash, jewelry, and drugs at that location, but also informs him that the homeowner is usually at home and the property is guarded by a hired security guard who Sam knows quite well. Sam tells Bob that he will help Bob commit the burglary by luring the security guard off the property, and it is understood that Bob will do whatever is necessary (i.e., kill the homeowner) if confronted by the homeowner during the burglary.

On the night of the burglary, Sam lures the security guard away from the property, and they go into town for a drink. However, when the security guard begins to get suspicious and tries to return to his post on the property, Sam forces the guard at gunpoint back into the car, hits him on the head with the firearm, and takes the unconscious security guard to a deserted area where he tries to decide what to do next. Meanwhile, while committing the burglary, Bob is confronted by the

55

homeowner. The homeowner activates a silent alarm, Bob shoots the homeowner, and the police arrive while Bob is still burglarizing the house. Although the homeowner dies moments after the police arrive, he is able to tell the police that he has surveillance cameras all throughout his property, explain that a security guard was supposed to be guarding the property, and gives them the security guard's cell phone number. From this information, the police observe Sam on the surveillance tapes luring the guard into a car, and they are able to track the security guard's location through the guard's cell phone. The police locate Sam and the unconscious but otherwise unharmed security guard, and they arrest Sam. Sam was armed with a firearm throughout his participation as a principal to the burglary and the homicide.

Based on these facts, it is clear that both Bob and Sam are guilty of armed burglary and, at a minimum, second degree murder. Because both Bob and Sam were armed with firearms during the commission of the acts that make them guilty of second degree murder, their convictions for second degree murder may be reclassified under section 775.087(1). Just like the defendant in our case, Sam committed acts that caused the death of the victim. The acts he committed were done from ill will, hatred, spite, or evil intent; were imminently dangerous to the victim; demonstrated a depraved mind; and indicated an indifference to human life, which a person of ordinary judgment would certainly know was reasonably certain to cause the death of the victim or cause serious bodily injury to another. Thus, just

56

like the defendant in our case, Sam is guilty of second degree murder because the evidence establishes each and every element of second degree murder; and Sam aided, incited, encouraged, and otherwise assisted Bob in committing the offenses, even though Sam was not present when the shooting occurred and he did not pull the trigger. Additionally, both the burglary and the homicide where on-going crimes. Although Sam was not present when Bob entered the house or shot the victim, he was armed when he committed the acts as a principal to both offenses. Thus, because Bob and Sam in this hypothetical, and the defendant in our case, were armed with firearms during the acts they committed and which caused the death of the victims, their convictions for second degree murder shall be reclassified to life felonies under section 775.087(1).

As these hypotheticals and this Court's prior opinion in Junco demonstrate, the homicide in the instant case was an on-going offense, and the defendant was armed while he committed acts which were intended to and did in fact incite, cause, encourage, assist, or advise his partners in crime (Bulger, Flemmi, and Martorano) to commit the murder, acts that pre-1957 would have made the defendant an accessory before the fact, but since 1957 make him for all purposes a principal in the first degree to the murder. The acts the defendant committed were also acts that were imminently dangerous to the victim, demonstrating a depraved mind without regard for human life, and these acts caused the death of the victim. Thus, whether

57

relying on the language regarding principals or the language of second degree murder itself, the reclassification of the defendant's conviction for second degree murder was lawful. In short, the murder began when the defendant told Bulger and Flemmi to "take care of" Callahan, and it ended when Callahan was actually shot and killed. Possession of a weapon at any point in the interim was "during the commission of the felony."

In 1999, the Florida Legislature specifically addressed the application of subsections (2) and (3) of section 775.087, regarding the imposition of minimum mandatory prison terms for criminals who possess firearms during the commission of an offense. In section 27.366, Florida Statutes (1999), the Florida Legislature specified that whenever a criminal offender meets the criteria in sections 775.087(2) and (3), and a minimum mandatory sentence is not imposed, the State Attorney must explain why the minimum mandatory sentence was not imposed in writing and maintain that explanation in the case file. While expressing its "zero tolerance" for those who possess firearms during the commission of an offense, the Florida Legislature recognized that "prosecutors should appropriately exercise their discretion in those cases in which the offenders' possession of the firearm is incidental to the commission of the crime and not used in furtherance of the crime, used in order to commit the crime, or used in preparation to commit the crime." Id.

Section 27.366 reads in full as follows:

It is the intent of the Legislature that convicted criminal offenders who meet the criteria in s. 775.087(2) and (3) be sentenced to the minimum mandatory prison terms provided herein. It is the intent of the Legislature to establish zero tolerance of criminals who use, threaten to use, or avail themselves of firearms in order to commit crimes and thereby demonstrate their lack of value for human life. It is also the intent of the Legislature that prosecutors should appropriately exercise their discretion in those cases in which the offenders' possession of the firearm is incidental to the commission of a crime and not used in furtherance of the crime, used in order to commit the crime, or used in preparation to commit the crime. For every case in which the offender meets the criteria in this act and does not receive the mandatory minimum prison sentence, the state attorney must explain the sentencing deviation in writing and place such explanation in the case file maintained by the state attorney.

Although section 27.366 is directed to subsections (2) and (3) of section 775.087, because section 775.087(1) does not include the "related to" or the "in furtherance of" language, and the Florida Legislature has expressed its zero tolerance for those who possess firearms during the commission of a crime, we reject the notion that section 775.087(1) should only apply to principals who are present when the last act or last element of a crime is committed, or when the firearm is used in furtherance of the crime. To do so violates the clear and unambiguous language of sections 777.011 (the principal statute), 775.087(1) (the reclassification statute), and 782.04(2) (the second degree murder statute). As the Florida Legislature has clearly stated, the decision as to whether to seek enhancement (or in this case a reclassification) of an offense when the firearm was incidental to the commission of the offense, lies within the State's discretion. And that discretion is further tempered

59

by the jury's pardon powers. If the Legislature granted prosecutors the discretion whether to seek enhanced sentences under section 775.087 "in those cases in which the offender's possession of a firearm is incidental to the commission of a crime and not used in furtherance of a crime, used in order to commit a crime, or used in preparation to commit a crime," then obviously prosecutors may exercise their discretion, as they did in this case, whether to seek a reclassification of the offense.

## VII. <u>Miscellaneous arguments raised in the concurring in part and dissenting in part opinion</u>

Lastly, we address the concurring in part and dissenting in part opinion's characterization of the defendant's role in the homicide as an "aider and abettor," whose acts were simply part of "the planning and preparation for the murder," and the opinion's discussion regarding attempts, solicitation, and other criminal statutes. The concurring in part and dissenting in part opinion proclaims that the defendant's acts merely "consisted of planning and preparation, [] which are insufficient to establish commencement of the crime," and for a crime to be committed, "[t]here must be proof of an overt act beyond mere preparation." While this is a correct statement of the law regarding attempts, this case does not involve an attempt. The defendant's acts occurred during the commission of the completed crime of second degree murder. Rather than addressing whether the defendant was armed during the commission of the sum total of the elements he committed to make him guilty of second degree murder, the dissenters separate the elements and ultimately conclude

60

that the defendant must have been armed with a firearm when one or all of the elements was satisfied in order for reclassification to occur under section 775.087(1).

As stated earlier, second degree murder is the unlawful killing of a human being by any act that is imminently dangerous to another and evincing a depraved mind regardless of human life. § 782.04(2). While it is true that there must be an overt act beyond mere preparation for an **attempted murder**, we are not discussing whether the defendant could have been convicted of attempted second degree murder if Martorano did not shoot Callahan. The crime the defendant and his co-defendants committed went past mere planning and preparation. They picked Callahan up at the airport, shot him in the head, and left his dead body in the trunk of a car in the parking garage at Miami International Airport.

Thus, the concurring in part and dissenting in part's discussion of "attempt" cases such as Arias v. State, 593 So. 2d 260 (Fla. 3d DCA 1992), Morehead v. State, 556 So. 2d 523 (Fla. 5th DCA 1990), State v. Coker, 452 So. 2d 1135 (Fla. 2d DCA 1984), and Robinson v. State, 263 So. 2d 595 (Fla. 3d DCA 1972), sheds no light on the issue in this appeal. The issue in this appeal is whether the defendant's conviction for the **completed crime** of second degree murder was lawfully reclassified under section 775.087(1) where the jury found that the defendant committed an act or acts that were imminently dangerous to another and which caused the death of Callahan, the jury found the defendant carried a firearm during

these acts, and there was evidence to support the jury's findings.

Additionally, the defendant did not simply participate in the planning and preparations of the murder, although if that was all he had done, he would still have been equally and legally responsible as a principal in the first degree to the murder. The defendant actually initiated and procured the murder of Callahan, and he did so not only to protect Bulger, Flemmi, and Martorano, but to protect himself. He needed Callahan to be silenced so everyone's acts, which included several murders in which Connolly was involved, would not be exposed. And the defendant was armed with a firearm when he procured, planned and prepared for the murder of Callahan. Callahan would not have been murdered but for the defendant's initiation of, and participation in, the commission of the murder.

The concurring in part and dissenting in part opinion also boldly asserts that the acts committed by the defendant while he was armed with a firearm were not acts that were imminently dangerous to the victim. The jury, however, found that they were. Moreover, the defendant does not dispute that he was lawfully convicted of second degree murder, which required the State to prove beyond a reasonable doubt that the **defendant** committed a criminal act that was imminently dangerous to another and demonstrating a depraved mind without regard for human life and this act **caused** the death of Callahan.

We do agree with the concurring in part and dissenting in part opinion that the

62

completed crime of second degree murder differs from solicitation, conspiracy, and possessory offenses. Each of these crimes becomes a completed crime when the solicitation, conspiracy, or possession occurs. Second degree murder differs in many respects. Procurement, planning, and an overt act or acts that do not cause the death of the victim, do not satisfy the requisite elements of second degree murder. That does not mean, however, that the defendant must possess a firearm during the commission of all of the elements of second degree murder. Section 775.087(1) imposes no such requirement. Section 775.087(1) provides that "whenever a person is charged with a felony . . . and during the commission of such felony the defendant carries . . . any weapon or firearm . . . the felony for which the person is charged shall be reclassified . . . ." And as the Merriam-Webster Dictionary clearly concludes—"during" means "at some time in the course of." Because the jury found, and the evidence established, that the defendant carried a firearm during his role in the commission of Callahan's murder, his conviction was properly reclassified under section 775.087(1).

Second degree murder is also a rather unique crime. Most crimes require a specific act or acts to give rise to criminal liability. For example, to commit the crime of robbery, an example relied on in the concurring in part and dissenting in part opinion, the defendant or defendants must take the property from the person or custody of the person with force, violence, assault, or by putting the victim in fear

63

during the course of the taking. § 812.13. Second degree murder does not require a specific act, such as shooting or stabbing the victim. Second degree murder only requires that the defendant commit some act—any act—that is imminently dangerous to another evincing a depraved mind regardless of human life and which ultimately causes the victim's death. § 782.04(2). The defendant committed such acts, his acts caused the victim's death, and he was armed with (carried) a firearm during these acts. These findings would have allowed the defendant to be convicted of second degree murder wholly apart from accomplice liability or the principal statute, i.e., the defendant is the "actual perpetrator" as well. Thus, his conviction was properly reclassified pursuant to section 775.087(1).

The concurring in part and dissenting in part opinion erroneously relies on Lemus v. State, 33 So. 3d 774 (Fla. 4th DCA 2010). In Lemus, the Fourth District Court of Appeal addressed whether under section 775.087(2)(a)2. (the "10/20/Life" statute), the trial court could impose twenty-year minimum mandatory sentences for each of the separate aggravated assaults committed by the defendant based on his discharge of a firearm during his standoff with the police. The Fourth District Court of Appeal correctly held that based on the facts of that case, the twenty-year minimum mandatory sentences could not be imposed for the aggravated assaults. Id. at 776.

Section 775.087(2)(a)2. provides in pertinent part that any person who is

64

convicted of a qualifying offense (including an aggravated assault) "and during the course of the commission of the felony such person discharged a 'firearm' . . . shall be sentenced to a minimum term of imprisonment of 20 years." Although the defendant discharged his firearm during his standoff with the police, because he did not discharge his firearm during the commission of either of the aggravated assaults (when he came outside the house and pointed his firearm at the police), the Fourth District Court of Appeal correctly held that section 775.087(2)(a)2. could not be used to impose twenty-year minimum mandatory sentences for the aggravated assaults. The aggravated assaults were wholly committed when Lemus pointed his weapon at the officers and cause fear. Thus, the entire commission of those aggravated assaults took mere seconds, and the defendant did not discharge a weapon during that time. In the instant case, the defendant may have carried his firearm during other criminal acts, but his second degree murder conviction was reclassified based solely on the firearm the defendant carried during the commission of the murder, and not some other offense. Further, unlike the defendant in Lemus, he carried his weapon while the crime of second degree murder was ongoing.

## CONCLUSION

Because the defendant did not timely object to the reclassification of second degree murder based on a defect in the indictment, he must demonstrate fundamental error to obtain a reversal of his conviction and sentence to second degree murder

65

with a firearm. The defect in the indictment was not a failure to charge an element of the crime; the defendant had notice that the State intended to prove that he carried a firearm during his role as a principal to the murder and that the State would seek a reclassification of the murder charge; the defendant has not claimed surprise or prejudice; and the reclassified second degree murder was not greater in degree or penalty than the charged offense. Therefore, no fundamental error has been shown, and we cannot reverse on that basis.

The jury's finding was also legally sufficient to permit reclassification of the second degree murder. The defendant specifically requested, and the trial court instructed the jury, that the firearm reclassification of second degree murder was to be treated as an element of second degree murder. Therefore, the jury was instructed that the lesser included offense of first degree murder was **second degree murder with a firearm**. The jury was instructed that it must find the defendant not guilty unless it concluded that the State proved beyond a reasonable doubt that the defendant carried a firearm when he committed an act or acts that were imminently dangerous to another and evincing a depraved mind regardless of human life, and that these acts caused Callahan's death. Thus, it cannot be disputed that the jury found that the defendant carried a firearm during the commission of the second degree murder.

Lastly, reclassification under section 775.087(1) does not require use of the

66

weapon that actually killed the victim, the defendant's physical presence during the last act that resulted in the victim's death, or that the firearm carried by the defendant be used in furtherance of the crime. Thus, because the reclassification of the defendant's conviction for second degree murder was based on his personal possession of a firearm during the acts he committed during the commission of the murder—acts that were imminently dangerous and evincing a depraved mind regardless of human life and which caused the death of Callahan—the reclassification of the second degree murder was not fundamental error.

Affirmed.

WELLS, SALTER, FERNANDEZ, LOGUE and SCALES, JJ., concur.

SUAREZ, C.J. (dissenting).

I respectfully dissent.  The majority decision has established an entirely new standard for the application of section 775.087(1), Florida Statutes,[6] governing the reclassification of certain crimes, not only in direct conflict with Florida Supreme Court precedent interpreting that statute, but also precedent out of every Florida district court of appeal including our own.  The majority's overbroad interpretation of the reclassification statute contravenes the long-held rule of statutory construction that "when the language [of the criminal statute] is susceptible of differing constructions, it shall be construed most favorably to the accused."  § 775.021(1), Fla. Stat. (1981) (providing the rules of construction for the provisions of that statute, which includes reclassification, section 775.087(1)).[7]

---

[6] Section 775.087(1), Florida Statutes (1981) (emphasis supplied) provides,

> Unless otherwise provided by law, whenever a  person is charged with a felony, except a felony in which the use of a weapon or firearm is an essential element, **and during the commission of such a felony the defendant carries, displays, uses, threatens, or attempt to use any weapon or firearm**, or during the commission of such felony the defendant commits an aggravated battery, the felony for which the person is charged **shall be reclassified** as follows: (a) In the case of a felony of the first degree, to a life felony. . .

[7] See, Kasischke v. State, 991 So. 2d 803, 814–15 (Fla. 2008) (observing in regard to ambiguous criminal statute that we "cannot simply choose our preferred

68

The statutory construction at issue in the language of section 775.087(1) is whether the words "carries, displays, uses . . . **any weapon** or firearm **during the commission of**" the offense refers to the weapon charged in the indictment and directly related to or available for use in the charged offense; or, as the majority now holds, that language refers to any weapon – charged or not – in the possession of a co-defendant, no matter how remote in time and geographical location from the actual charged crime. Up until today, section 775.087(1) has been interpreted throughout the state to require the defendant to have carried, displayed, used, threatened or attempted to use the weapon actually used or available for use in commission of the felony. In this case, that weapon is co-perpetrator Martorano's own gun that Martorano used to murder Callahan.

Even appellate counsel for the State conceded at oral argument there is no case law in the entire jurisprudence of this state, or in the entire country so far as we can discern, to support today's interpretation and application of section 775.087(1) to reclassify based on 1) a co-defendant's carrying, using, displaying, etc., a weapon not charged or mentioned in the indictment or information; 2) where that weapon

construction" and "In Florida, the rule [of lenity] is not just an interpretive tool, but a statutory directive"); <u>Lambert v. State</u>, 545 So. 2d 838, 841 (Fla. 1989) ("In construing [penal] statutes, we begin with the principle that, where criminal statutes are susceptible to differing constructions, they must be construed in favor of the accused.").

was not the weapon used or available for use in the commission of the crime, and; 3) the defendant was remote in time and place from the commission of the crime. Case authority in Florida up to the present leads to only one conclusion: that Connolly's conviction for second-degree murder as a principal was not subject to being reclassified under the statute. Because reclassification is inapplicable, the statute of limitation for the underlying offense has expired and the conviction should be vacated.

Let me be clear: Connolly's conviction for second-degree murder is <u>not</u> the issue before us on appeal. Connolly's participation in egregious acts and culpability as a principal should not enter into our analysis of the very specific and circumscribed legal issue raised by the parties in this appeal: whether section 775.087(1) allows reclassification of Connolly's conviction of the lesser included offense of second-degree murder as a principal where Connolly was not present during the commission of the offense, and never carried the firearm used and charged in the indictment and referred to in the verdict.

At the outset, we must recognize the unusual procedural posture of this case. In 2005, the State of Florida decided to charge Connolly with murder in the first degree, as well as conspiracy to commit first-degree murder, although the criminal events occurred twenty-three years earlier, in 1982. The statute of limitation had run on the lesser included felony of second-degree murder, and any such conviction

70

would have to be vacated. [8]

After trial, the jury acquitted Connolly of both conspiracy and first-degree murder, but found him guilty of the lesser included offense of second-degree murder as a principal. This result put the State between a rock and a hard place: the State wanted Connolly incarcerated and had risked a great deal to achieve a conviction, but everyone knew that the statute of limitation had run on the crime of second-degree murder, and Connolly would have to be released. There was only one way for the State to repurpose the conviction, and that was to argue that Connolly's conviction for second-degree murder should be reclassified to a life felony pursuant to section 775.087(1), as there is no statute of limitation on a life felony. Connolly would then be exposed at sentencing to a term of years up to life in prison. The problem the State faced is that years of case law had interpreted section 775.087 to require the defendant to have been in actual possession of (carried, displayed, etc.) the weapon during commission of the crime, in order for a conviction to be reclassified. The State then pursued a novel theory to justify reclassification: the State argued that a literal reading of section 775.087(1) required only that the defendant possess "any" weapon or firearm. Thus, the State proposed, if during the commission of the crime the defendant carried "any weapon or firearm," that

---

[8] See § 775.15(2) (a), Fla. Stat. (1982) ("A prosecution for a felony of the first degree must be commenced within 4 years after it is committed.")

defendant's conviction could be reclassified pursuant to section 775.087(1). Connolly, though in Boston at the time of the murder, was obligated to wear his FBI-issued service weapon and thus, argued the State, he "carried" a firearm "during the commission of the felony," referring to the language of section 775.087(1). The State got a verdict that, superficially at least, appeared to allow reclassification on this basis.

Two questions emerge from this case: What time period is encompassed by the language "during the commission of the offense," and, as among multiple defendants, to what weapon does the statutory phrase "any weapon or firearm" refer? The controversy over how this specific language within section 775.087(1) should be applied to the facts before us is the crux of this appeal.[9] My analysis of the issue

---

[9] In yet another procedural twist, one month after the trial Connolly filed a motion in arrest of judgment on grounds that the second-degree murder conviction could not be reclassified to a life felony and was therefore barred by the statute of limitation. The trial court agreed with Connolly that the second-degree murder conviction could not be reclassified as Connolly did not personally carry the murder weapon and was in Boston during the commission of the offense. The trial court rejected the State's argument that, as Connolly always carried his firearm while on duty, this constituted "possession' of a weapon. The trial court noted that,

> This argument fails to take into account that the Defendant having a weapon three weeks prior to the murder does not change the fact that [he] had to have possessed the actual murder weapon at the time of the murder for the reclassification of second degree murder with a firearm under §§ 775.087 and 777.011, Fla. Stat., to apply.

The trial court was nonetheless compelled to deny Connolly's motion, correctly ruling that as defense counsel filed the motion more than ten days after rendition of

on appeal has not changed: the "during the commission" of the murder refers to the discrete and time-limited act of shooting the victim with a firearm; the "any weapon or firearm" refers to one that was used or available for use during commission of that offense. Without the erroneous application of reclassification, Connolly's conviction for second-degree murder as a lesser included offense of first-degree murder was barred by the applicable statute of limitation, and his sentence should be vacated.[10]

---

the verdict, the court had lost jurisdiction as the motion was untimely filed pursuant to Florida Rules of Criminal Procedure 3.610(c) and 3.590(a).

[10] See Toussie v. United States, 397 U.S. 112, 114-115 (1970):

> The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity. For these reasons and others, we have stated before "the principle that criminal limitations statutes are 'to be liberally interpreted in favor of repose.' "

See also Mead v. State, 101 So. 2d 373, 375 (Fla. 1958) ("The appellant was not required to raise the question of the statute of limitations as the statute must be construed liberally in favor of defendants and need not be pleaded in bar. It was incumbent on the state not only to prove that the appellant perpetrated the crime but that he did so within [the statute of limitation period] of the filing of the information on which he was being tried.").

**BACKGROUND**

In 2005, former FBI agent Connolly was charged by indictment, as a principal,[11] with co-defendants James Bulger, Stephen Flemmi and John Martorano, with first-degree murder (Count 1)[12] and conspiracy to commit first-degree murder (Count 2).[13] The indictment alleged that Connolly, while actively employed as an FBI agent, participated in a scheme to murder businessman John Callahan in South Florida on or about July 31, 1982. The State submitted evidence at trial that Connolly met a few times with co-defendants Bulger, Flemmi and Martorano in New York and/or Boston over several weeks preceding the murder. This evidence comprised the basis for the State's charge of conspiracy to commit first-degree

---

[11] §777.011, Fla. Stat. (1981), Principal in the first degree; see also fn.17, infra.

[12] Count 1 of the indictment states that four co-perpetrators, Bulger, Flemmi, Martorano, and Connolly:

> did unlawfully and feloniously kill a human being, to wit: JOHN B. CALLAHAN, from a premeditated design to effect the death of the person killed or any human being, by shooting the said JOHN B. CALLAHAN with a firearm, in violation of s. 782.04(1), s. 775.087, and s. 777.011, Florida Statutes . . . .

[13] Count 2 states that the same four co-defendants,

> "did unlawfully and feloniously agree, conspire, combine, or confederate [with one another] to commit a criminal offense, to wit: Murder in the first degree with a firearm upon JOHN B. CALLAHAN, in violation of s. 782.04(1), s. 777.04(3), s. 775.087, and s. 777.011, Florida Statutes . . . ."

murder. The State's evidence at trial also indicated that the scheme to murder Callahan occurred during these meetings. Further, the State's evidence indicated Connolly wore his FBI-issued service weapon while he was at these meetings and, by implication, over the time period Callahan was murdered. However, the State's evidence also showed that at the time of the actual murder, which occurred somewhere between Broward and Miami-Dade Counties, Florida, Connolly and his service weapon were both approximately 1,400 miles away in Boston, Massachusetts. It was undisputed that co-defendant Martorano used his own gun to shoot Callahan, and that Connolly never carried, displayed, used, or threatened to use the murder weapon.

In 1982, when the murder occurred, the statute of limitation for a first-degree felony was four years. § 775.15(2) (a), Fla. Stat. (1981). Thus, by the time Connolly was indicted in 2005, the four-year statute of limitation had expired some nineteen years earlier for the first-degree felonies of conspiracy to commit first-degree murder, section 777.04(4) (b), Florida Statutes (1981), and second-degree murder, section 782.04(2), Florida Statutes (1981).[14] Any conviction on those charges was thus barred by the four-year statute of limitation in effect at the time of the 1982

---

[14] "It is firmly established law that the statutes in effect at the time of commission of a crime control as to the offenses for which the perpetrator can be convicted, as well as the punishments which may be imposed." State v. Miranda, 793 So. 2d 1042, 1044 (Fla. 3d DCA 2001).

murder. The trial court denied Connolly's motion to dismiss the charge in Count 2 of conspiracy to commit first-degree murder with a firearm. Connolly did not move pre-trial to dismiss Count 1, first-degree murder with a firearm, based on the State's failure to charge him with possession of a separate firearm because reclassification was not an issue: first-degree murder in 1982, and at present, was a capital felony and cannot be reclassified to a higher offense.

At the conclusion of the trial, during the jury instruction conference, the discussion turned to lesser included offenses. The trial court pointed out that, were Connolly to be convicted of second-degree murder <u>without</u> a firearm, the statute of limitation would be found to have run and Connolly would be discharged. The defense repeatedly objected to inclusion of any lesser included offenses. The State requested the jury be instructed on second-degree murder with a firearm as a lesser included offense of first-degree murder. The State argued if Connolly were so convicted, it would seek reclassification of that first-degree felony to a life felony pursuant to section 775.087(1), and that a life felony was not barred by the four-year statute of limitation.

The trial court granted the State's request over defense counsel's objection, adding "carrying a firearm," as a fourth element to the second-degree murder instructions. The jury was thus instructed that to find Connolly guilty of second-degree murder they must find the following four elements beyond a reasonable

doubt: 1) Callahan is dead; 2) His death was caused by the criminal act of Connolly; 3) There was an unlawful killing of Callahan by an act imminently dangerous to another and demonstrative of a depraved mind without regard for human life; and 4) During the act, Connolly carried a firearm.

The jury acquitted Connolly of Count 2, conspiracy to commit first-degree murder with a firearm, as well as Count 1, first-degree murder, but found him guilty of the lesser included offense subsumed within Count 1 of second-degree murder with a firearm. The verdict form simply stated, "Guilty of second-degree murder, with a firearm, as a lesser included offense of first-degree murder." Based on the jury's verdict that found Connolly guilty of second-degree murder "with a firearm," the trial court reclassified the conviction to a life felony pursuant to section 775.087(1) and sentenced Connolly to forty years in prison.

**ANALYSIS**

> **1)   Count 1 of the indictment failed to provide Connolly with notice that a conviction for a lesser included offense as a principal could be reclassified based on his own weapon, where Connolly was not present during the commission of the offense, and his weapon was unrelated to the commission of the offense.**

It is pure sophistry to argue that the general reference to section 775.087 in Count 1 of the indictment put Connolly on notice that his service weapon—an

77

uncharged[15] firearm completely unrelated to the murder, located in an entirely different state at the time of the offense, could later be the basis for reclassifying a time-barred conviction of a lesser included offense to a non-time-barred life felony, for committing the offense "with a firearm."[16] Due process of law requires the State to allege every essential element when charging a violation of law to provide the accused with sufficient notice of the allegations against him. Art. I, § 9, Fla. Const.; M.F. v. State, 583 So. 2d 1383, 1386-87 (Fla. 1991). In this case, there has been a fundamental denial of due process because the Defendant's conviction was erroneously reclassified based on a charge not made in the information or indictment. See Thornhill v. Alabama, 310 U.S. 88 (1940);[17] compare Inmon v.

---

[15] When I refer to an "uncharged," weapon in this dissent, I mean that the firearm used as the basis to reclassify the conviction is not the one specifically referred to in the charge of first-degree murder in Count 1 of the Indictment. Count 1 only specifically mentions the firearm used to murder Callahan and no other weapon. Connolly's firearm is thus "uncharged."

[16] The State cites to Miller v. State, 460 So. 2d 373 (Fla. 1984), to support its argument that reclassification was proper. It is true that the primary charge in an indictment or information includes all lesser included offenses, for purposes of reclassification, but I cannot agree that Miller supports reclassification pursuant to section 775.087(1) based on a weapon uncharged and unrelated to the commission of the offense. Miller, in addition, involved one defendant, not multiple co-defendants, and it was clearly established that Miller had actually used the handgun during the commission of the crime.

[17] "A conviction on a charge not made by the indictment or information is a denial of due process" and an indictment or information that "wholly omits to allege one or more of the essential elements of the crime" cannot support a conviction for that crime. State v. Gray, 435 So. 2d 816, 818 (Fla. 1983). This is a deficiency that can

State, 932 So. 2d 518, 520 (Fla. 4th DCA 2006) (holding that State's failure to specifically reference the subsection within section 775.087 in the information renders notice of the particular enhancement sought against the defendant insufficient).

Count 1 of the indictment alleged the four co-perpetrators killed Callahan "by shooting the said JOHN B. CALLAHAN with a firearm,"  but does not allege Connolly personally possessed, used, or carried a firearm, either the murder weapon or Connolly's FBI-issued firearm, during the commission of the murder.  The only weapon implied by "shooting . . . JOHN B. CALLAHAN" is the murder weapon. The State acknowledges it was uncontested the only gun used to shoot the victim was possessed and discharged by co-defendant Martorano and Connolly is not the person who effected "the death of [the victim] by shooting [the victim] with a firearm."[18]  Further, the phrase "with a firearm" is clearly singular, and refers to the manner in which John Callahan was killed:  it is clearly a reference to the only firearm used.  From the language of Count 1, no reasonable person could conclude

---

be raised at any time.  Id.  The Florida Supreme Court has consistently applied these principles.  See, e.g., Jaimes v. State, 51 So. 3d 445, 448 (Fla. 2010) ("It is a fundamental principle of due process that a defendant may not be convicted of a crime that has not been charged by the state."); Price v. State, 995 So. 2d 401, 404 (Fla. 2008) (reiterating that the failure to allege an essential element of a crime may be raised in a habeas petition).

[18] See fn.7, supra.

that the State was planning to apply section 775.087(1), upon possible conviction for a lesser included offense, to an unmentioned firearm that had nothing to do with the murder.

The State argues that Connolly's failure to challenge the sufficiency of the indictment by motion to dismiss constituted a waiver and should have precluded his ability to raise the issue at a later time. The State's arguments on the issue of waiver are entirely unpersuasive. First, Connolly had no reason to seek to dismiss the first-degree murder charge in Count 1 of the indictment because it is a capital felony, punishable by death, and is not subject to reclassification or enhancement as there is no higher punishment level. Further, the charging document failed to place Connolly on notice that conviction on a lesser included offense would subject him to reclassification pursuant to section 775.087(1) because the language of Count 1 did not expressly single him out, as one of the four equally charged co-defendants, with actually possessing, carrying, using or discharging a second firearm, i.e., his FBI-issued sidearm. Martorano's firearm, the murder weapon, was the only weapon charged in Count 1. As this was a multi-defendant case and only one of the defendants, Martorano, used the gun to shoot the victim, Connolly would have no reason to conclude that the general reference in Count 1 to section 775.087 pertained

80

to him rather than the actual shooter.[19]  Connolly's only avenue of relief was to object to the inclusion of any lesser included offenses, which the record clearly shows his defense counsel strenuously and continuously did.

The State relies on Mesa v. State, 632 So. 2d 1094 (Fla. 3d DCA 1994), to support its contention that Connolly's failure to object prior to trial to the charging document as flawed amounts to waiver.  But Mesa is pointedly distinguishable in several ways.  First, and most important, Mesa involved only one defendant and one gun, the gun used in the crime.  There was no opportunity for confusion regarding who committed the crime and used the weapon.  Thus, the general reference to section 775.087 in Mesa's charging document was enough to put him on notice that the prosecution was seeking reclassification under subsection (1) and/or enhancement for possession of a firearm under subsection (2) because he was the only defendant, and there was only one weapon involved.  Further, the reference in the indictment that Mesa "did shoot" the victim put him on notice that, as he was the only perpetrator, he was charged with actually using a firearm in the crime.  In addition, the jury specifically found that Mesa actually used a firearm via a special verdict form, to which he did not object.  Thus, there was a clear jury finding that

---

[19] At the time of the indictment and trial, case precedent interpreted the language of section 775.087 to apply only to the defendant who actually possessed, carried, displayed, etc. the actual weapon used in commission of the offense.  Connolly never possessed, used, displayed, or even had knowledge of the gun used to kill Callahan and, additionally, was approximately 1,400 miles away when the murder occurred.

Mesa personally used the weapon. Finally, I note that Mesa was charged in the information with second-degree murder, not first-degree murder. Mesa was thus aware that his conviction could be reclassified as a higher degree felony.

Contrary to the facts in Mesa, Connolly was not the sole defendant, but was one of four co-perpetrators equally charged with first-degree murder; that crime cannot be reclassified to a higher offense; Connolly did not shoot Callahan; Connolly did not carry, display, possess, use or threaten to use, the murder weapon; and Connolly was miles from the murder at the time it was committed. Mesa and progeny are inapplicable to the specific facts presented in this case.[20] [21]

The State asserts that Connolly cannot claim that he was not on notice of the possibility of reclassification because, as early as two years prior to trial, Connolly

---

[20] Connolly does not challenge the language in Count 1 of the indictment as defective, as the State persistently argued, but rather that the statutory basis for reclassification upon conviction for a lesser included offense was not charged, i.e., carried, displayed, used, threatened or attempted to use, a second weapon during the commission of the felony.

[21] The State correctly notes that the test for granting relief based on a defect in a charging document is actual prejudice, and argues that there was no prejudice to Connolly because first-degree murder and the lesser included offense of second-degree murder both carry a maximum penalty of life, citing to State v. Gray, 435 So. 2d 816 (Fla. 1983), and Delgado v. State, 43 So. 3d 132 (Fla. 3d DCA 2010). I find no greater "actual prejudice," however, than the facts presented by Connolly's case: conviction for a first-degree felony alone would have resulted in discharge under the applicable statute of limitation, but reclassification based on uncharged and unproven "carrying" of a weapon completely unrelated to the charged offense resulted in a forty-year sentence.

82

had actual notice that the State was seeking to reclassify a lesser charge on the specific basis of Connolly's possession of a firearm during the Count 2 conspiracy offense. As we explain below in this opinion, upon conviction of a lesser included offense to Count 2 conspiracy, reclassification based on Connolly's firearm – which he carried during the conspiratorial meetings – would have been legally permissible had Connolly not, in fact, been acquitted of that charge. In that context, Connolly was appropriately charged with carrying his service weapon during the commission of the crime of conspiracy because it is an ongoing offense taking place over a period of time. See generally, Rosen v. State, 757 So. 2d 1236 (Fla. 4th DCA 2000) (explaining application of statute of limitation to continuing, as contrasted with discrete, offenses). During the conspiracy, Connolly met with his co-defendants and the evidence indicated that, while participating in these meetings, Connolly wore his service weapon. Reclassification for carrying a weapon during an ongoing offense is legally supported. Section 5, infra. Connolly was, however, **acquitted of the Count 2 conspiracy charge**, rendering moot the merit of his pretrial motion to dismiss that count. As I discussed above, the State's assertion that Connolly was on actual notice of the applicability to him of the reclassification statute upon conviction of any lesser included offense within the **Count 1 first-degree murder charge** is untenable. Let us not confuse these two counts or the statutory elements necessary to prove those two entirely separate criminal offenses.

83

The State concedes there is no case law to support its unprecedented theory that reclassification upon conviction of a lesser included offense to first-degree murder could be accomplished where the co-defendant was not present during the offense, and did not actually carry, display, use or threaten to use, the actual firearm used by his co-defendant in the commission of the felony. The established case law at time of trial and at present is that, in a felony involving the use of a weapon, a defendant's sentence may only be reclassified upon a showing that the defendant had personal possession of the weapon during the commission of the felony. State v. Rodriguez, 602 So. 2d 1270 (Fla. 1992). The State's theory justifying reclassification, that Connolly carried his FBI-issued firearm during talks with his co-conspirators weeks prior to the murder is, as everyone agrees, an issue of first impression and Connolly cannot be said to have either anticipated or waived the issue. Where the State failed to allege in Count 1 that Connolly carried, displayed, used, threatened to use or attempted to use a second, unrelated firearm during the commission of the homicide, I conclude reclassification pursuant to section 775.087(1), given the facts in this case, was improper. The case controlling application of section 775.087(1) is the Florida Supreme Court case of State v. Rodriguez, 602 So. 2d 1270 (Fla. 1992). Between the holding of Rodriguez and the language of section 775.087(1) lies "language susceptible of differing construction." § 775.021(1).

**2)    It was error to reclassify based on a conviction as a principal for vicariously possessing the only weapon charged in count 1 and actually used in the murder.**

Connolly could properly have been convicted as a principal of the lesser included offense of second-degree murder pursuant to section 777.011, Florida Statutes (1981).[22]  But a defendant's conviction may not be reclassified for a co-defendant's possession of a firearm during a felony.  Rodriguez, 602 So. 2d at 1270.

In Rodriguez,[23] the Florida Supreme Court construed the language of section 775.087(1) and answered this certified question in the negative:  "Does the

---

[22] Section 777.011 reads:

> Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he is or is not actually or constructively present at the commission of such offense.

[23] Rodriguez actually arose out of our court.  State v. Rodriguez, 582 So. 2d 1189 (Fla. 3d DCA 1991).  In that case, the police attempted to pull Rodriguez's car over and a high speed chase ensued.  During the chase, a passenger in Rodriguez's car picked up a rifle from the car seat and shot at the police.  At trial, Rodriguez's conviction was reclassified pursuant to section 775.087(1).  Upon post-trial motions, the trial court agreed the reclassification was illegal as Rodriguez never possessed the rifle that that was fired by the co-perpetrator during the chase. On appeal, this court agreed.  **"This court has previously ruled that "the enhancement provisions of section 775.087(1), Florida Statutes (1977), . . . requires that the defendant personally possess the weapon during the commission of the crime involved."** Id. at 1190 (citing to Postell v. State, 383 So. 2d 1159, 1162 (Fla. 3d DCA 1980)) (emphasis supplied).

enhancement provision of subsection 775.087(1), Florida Statutes (1983), extend to persons **who do not actually possess the weapon but who commit an overt act in furtherance of its use by a coperpetrator?**" Id. at 1271. The Court focused on the language of subsection 775.087(1), which requires that *the defendant* carry, display, use, threaten, or attempt to use any weapon or firearm. Id. [emphasis in original]. The Court held that when a defendant is charged with a felony involving the "use" of a weapon, his or her sentence cannot be enhanced [reclassified] under section 775.087(1) without evidence establishing that the defendant had personal possession of the weapon during the commission of the felony. Id. at 1272. The Court explicitly rejected the idea that a defendant could be subject to reclassification under subsection 775.087(1) as a principal, i.e., **where the defendant did not personally possess the weapon used during the commission of the offense**. Id.

In the case before us, Count 1 of the indictment refers only to the murder weapon used by co-defendant Martorano and does not charge Connolly with possession or use of a second weapon (his own) in the commission of that offense. The evidence is undisputed that Connolly never possessed, carried, displayed or used the firearm used by Martorano to kill Callahan. Pursuant to Rodriguez, Martorano's firearm cannot be viewed as constructively possessed by Connolly for purposes of reclassification to avoid the statute of limitation on first-degree felonies. See id. Further, the verdict form did not include any interrogatory regarding Connolly's

actual possession of the firearm alleged in Count 1, nor did the jury, by its verdict, make any finding that Connolly personally possessed the firearm used to shoot the victim. In <u>Rodriguez</u>, the firearm described in the information as the one used during the attempted murder "was at no time carried, displayed, used, or attempted to be used" by the defendant. 602 So. 2d at 1271-72. The <u>Rodriguez</u> Court reached its holding despite the plain language of the statute indicating "any" weapon, not "the" weapon was "carried, displayed, used," etc.

### 3) It was error to reclassify based on carrying a weapon remote in time and unrelated to the charged offense.

The State proposes that a finding of "any" weapon on a principal co-defendant, however remotely situated, is enough to ground reclassification. This is contrary to the holding of <u>Rodriguez</u> and its related cases because the <u>Rodriguez</u> Court also noted in its opinion that the defendant's sentence "could have been "enhanced" (more accurately, reclassified) under section 775.087(1) if the State had charged him with the commission of a felony while carrying the pistol that was found on his person after the chase. "**The failure of the State to properly charge Rodriguez precludes it from enhancing his sentence under the carrying portion of the statute**." 602 So. 2d at 1272 (emphasis added). In the case before us, Connolly was not charged in Count 1 with carrying, displaying, using, etc., his service revolver during the commission of the murder, nor was that uncharged weapon at all related to the murder offense. <u>See, e.g.</u>, <u>Arnett v. State</u>, 128 So. 3d 87

87

(Fla. 1st DCA 2013) (holding that 775.087 enhancement was improper where the grounds for enhancement were not clearly charged in the information, and a jury finding that the appellant actually possessed a firearm does not cure the charging defect). The same conclusion as arrived by the Florida Supreme Court in Rodriguez applies here. Consequently, the trial court's reclassification was fundamentally erroneous.

The majority's legal conclusion contradicts years of case authority interpreting section 775.087(1) as requiring that the defendant must personally possess the weapon used in the commission of the crime so charged. See e.g., Chase v. State, 74 So. 3d 1138 (Fla. 2d DCA 2011) (holding that defendant's conviction for aggravated battery should not have been reclassified from a second-degree felony to a first-degree felony based on use of a weapon pursuant to section 775.087(1), where the evidence showed that only the co-defendant possessed or used a weapon during the offense); Alusma v. State, 939 So. 2d 1081 (Fla. 4th DCA 2006) (reversing reclassification under section 775.087(1) where the defendant was convicted as a principal with his co-defendant, and the verdict did not reflect that the defendant was in actual possession of the firearm during the offense); Parker v. State, 906 So. 2d 1273 (Fla. 5th DCA 2005) (noting that reclassification under section 775.087(1) is impermissible unless the defendant actually possesses a weapon during the commission of the crime); Porter v. State, 737 So. 2d 1119, 1119 (Fla. 2d

88

DCA 1999) (citing <u>Rodriguez</u> for the proposition "that section 775.087(1) does not permit vicarious enhancement"); <u>Clark v. State</u>, 701 So. 2d 912 (Fla. 4th DCA 1997) (same; citing to <u>Rodriguez</u>, and <u>Williams v. State</u>, 622 So. 2d 456 (Fla. 1993)); <u>Williams v. State</u>, 656 So. 2d 574, 575 (Fla. 1st DCA 1995) (holding murder sentence cannot be enhanced under section 775.087(1) where the jury specifically found "a firearm not in [defendant's] physical possession was used" in the course of committing the murder); <u>Robins v. State</u>, 602 So. 2d 1272 (Fla. 1992) (quashing affirmance of reclassification under section 775.087(1) based on co-defendant's wielding of gun during commission of kidnapping offense); <u>Willingham v. State</u>, 541 So. 2d 124 (Fla. 2d DCA 1989) (holding it error to reclassify a sentence for use of a weapon during the discrete act of sale of drugs based on vicarious possession, where the co-defendant possessed the firearm during the transaction). The cited cases demonstrate that, when no evidence is presented that a defendant personally carried, displayed, used, threatened to use, or attempted to use a weapon related to the commission of the charged crime, it is error for the trial court to enhance the defendant's sentence based on a co-defendant's use of a firearm.

**4) Connolly's conviction as a principal pursuant to section 777.011, would have been legally permissible (if not time-barred), but reclassification of his conviction is not.**

But for the expiration of the statute of limitation, Connolly could have been convicted of second-degree murder as a Principal in the first degree, pursuant to

section 777.011, which provides,

> 777.011 Principal in first degree.—Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.

But the Florida Supreme Court explicitly rejected the idea that a defendant could be subject to reclassification under subsection 775.087(1) as a principal. Rodriguez, 602 So. 2d 1270. On the facts before us, the criminal offense referenced in section 777.011 is the criminal offense for which the State sought to convict Connolly in Count 1. That is to say, the State charged Connolly as a principal in Count 1 with the first-degree murder of Callahan by shooting him with a firearm, not any underlying conspiracy that may have precipitated the murder, i.e., the "act" of meeting with co-perpetrators weeks earlier.

**a) The language in section 775.087(1), "during the commission of the offense," refers to the homicide, not the acts of conspiracy contributing to the homicide.**

"Act" is defined in the standard jury instructions as including "a series of related actions arising from and performed pursuant to a single design or purpose." Fla. Std. Crim. Jury Inst. 7.4. The state argued, and the majority here concludes, that the meetings Connolly had with the co-conspirators three weeks before Callahan's murder comprised the "act" referred to in the jury instructions. The majority posits

90

that the "act" of meeting with the co-conspirators was performed with "a single design or purpose," i.e., to kill Callahan.

Connolly's complicity in the murder, however, is limited to his role in the conspiratorial meetings, acts for which he was acquitted.   The "acts" necessary to plan and accomplish the actual murder were performed by the co-perpetrators, not by Connolly.[24] The majority, however, ignores the conspiracy acquittal and judicially expands the definition of "act" by engrafting elements of the ongoing crime of conspiracy to the discrete crime of murder in order to justify reclassification based on the unrelated weapon.  The majority's interpretation of "act" to encompass elements of the conspiracy conflates the two entirely separate statutory crimes of conspiracy and murder, and the evidence necessary to prove them.  The majority's "plain reading" rationale introduces an unprecedented and unjust application of the definition of "act" in order to justify reclassification of the murder conviction based on Connolly's entirely unrelated and uncharged firearm.[25]  This conclusion is not

---

[24] Martorano convinced Callahan that they needed to meet to discuss the recent killing of another business associate. Martorano picked Callahan up at the Ft. Lauderdale airport; Callahan got into the van's front seat while Martorano put his luggage in the back seat. Martorano then shot Callahan in the back of the head. Martorano and an associate then transferred the body to the trunk of Callahan's Cadillac, drove to Miami International Airport and left the car in the parking garage. They concocted a story about Callahan having a problem with a Cuban group in south Florida in order to deflect investigations away from Bulger and Flemmi in Boston.

[25] Under the majority's rationale, a defendant who is not present during the commission of a felony but who "carries, displays," etc. a weapon or firearm (for

supported by precedent.  See Perkins v. State, 576 So. 2d 1310, 1312 (holding that, to the extent a statutory word or phrase is vague or ambiguous, the court is under an obligation to construe it in the manner most favorably to the accused).  "Words and meanings beyond the literal language [of the statute] may not be entertained nor may vagueness become a reason for broadening a penal statute."  Id. at 1312; see also Lemus v. State, 33 So. 3d 774, 776 (Fla. 4th DCA 2010) (rejecting, as contrary to both the plain meaning of the statute and the "rule of lenity," the State's overbroad interpretation of 775.087 that, as the defendant fired a revolver while earlier engaged in a standoff, the weapon was fired during the "criminal episode" of the subsequent assault for purposes of applying a mandatory minimum sentence under that statute); Kasischke, 991 So. 2d at 814–15 (Fla. 2008); Lambert, 545 So. 2d at 841 (Fla. 1989).

Even if one considered each of Connolly's meetings with the co-conspirators to be an "act," for purposes of convicting him of murder, the reclassification still will not stand because at each of those meetings or "acts" Connolly did not carry, display, use, threaten or attempt to use the firearm explicitly charged in Count 1, the murder weapon, Martorano's firearm.  Rodriguez, 602 So. 2d at 1272 ("When a

_____

example, a legally registered weapon worn or possessed by valid concealed weapons permit) unrelated to the felony itself, may be convicted as a principal and have his or her conviction reclassified based on that unrelated weapon.  The policy implications of this holding are profound.

92

defendant is charged with a felony involving the 'use' of a weapon, his or her sentence cannot be enhanced under section 775.087(1) without evidence establishing that the defendant had personal possession of **the** weapon **during the commission of** the felony.") [emphasis supplied].

**5) Connolly was acquitted of conspiracy, the only charge that would support reclassification for committing the offense "with a firearm."**

Had Connolly been convicted as charged in Count 2 of conspiracy to commit first-degree murder with a firearm, reclassification under section 775.087(1) would have been proper. There was competent and sufficient evidence presented at trial that Connolly met with the co-defendants over several weeks prior to the actual murder event. Evidence was presented at trial that Connolly was obligated to carry his FBI-issued firearm while on duty as an FBI agent, and that he was observed at various times wearing his firearm during those meetings with the co-defendants. The illegal nature of those transactions and Connolly's participation in those illegal meetings while carrying his service weapon formed the factual basis for charging Connolly with the ongoing crime of conspiracy to commit first-degree murder with a firearm. A co-defendant's possession of a weapon during an ongoing offense, such as trafficking or conspiracy, can be used to reclassify the sentence upon conviction as a principal. See e.g., Smith v. State, 438 So. 2d 10 (Fla. 2d DCA 1983) (holding reclassification proper where evidence supported finding that one defendant had a

firearm in the immediate area of the crime, and another defendant carried a firearm while in the discrete act of possessing marijuana); Menendez v. State, 521 So. 2d 210, 212 (Fla. 1st DCA 1988) (finding competent substantial evidence that defendant carried or used a firearm during the course of the ongoing offense of cocaine trafficking sufficient to support reclassification pursuant to section 775.087(1); noting that crimes covered by section 775.087 require actual possession because they are generally of short duration and the purpose served by the firearm requires physical possession of the weapon) (emphasis supplied).

Such precedent is without application here, however, because Connolly was acquitted of the ongoing crime of conspiracy to commit murder, and the evidence supporting the "with a firearm" element of that charge cannot be transplanted to the separate and discrete charge of murder. The "with a firearm" elements of Count 1 and Count 2 refer to entirely different criminal acts with different statutory elements, and do not rely on evidence of possession or use of the same weapon. The "shooting . . . JOHN B. CALLAHAN with a firearm" element of the first-degree murder charge refers to the actual murder weapon. Whereas Connolly's possession of his service weapon would have correctly supported the "with a firearm" element of the conspiracy to commit murder charge set forth in Count 2 of the indictment. The two charges in this case and the evidence supporting them are not interchangeable. See Brown v. State, 130 So. 479 (Fla. 1938) (holding that the

94

commission of a substantive crime and a conspiracy to commit the substantive crime are separate and distinct offenses).  As I have previously explained, Connolly's conviction cannot be reclassified based on Martorano's possession of the only weapon charged in Count 1.  See Willingham, 541 So. 2d at 1240 ("A plain reading of section 775.087(1) would be to require proof that Willingham actually carried or used a firearm during the course of the offense.  Any other interpretation is not expressed clearly in the statute, and even if susceptible to such a construction, i.e., principal theory can be used to establish use of firearm, the construction more favorable to the defendant must be given effect."); Menendez, 521 So. 2d at 215, n.3; cf. Glynn v. State, 868 So. 2d 1280 (Fla. 4th DCA 2004) (noting the difference between a continuous or ongoing criminal offense and one involving discrete acts, for sentencing purposes).

Furthermore, the conviction cannot be reclassified based upon Connolly's possession of his FBI-issued service weapon in Boston at the time of the murder in Florida.  Of the reclassification cases I have examined in this appeal, those cases uniformly present facts showing the weapon used to reclassify the crime to a higher offense was both temporally and spatially related to the crime committed.  The facts here are in stark contrast: Connolly was hundreds of miles away in Boston at the time the discrete act of murder occurred; he may or may not have "carried" his service weapon at the time of the murder.  It is beyond question that Connolly's

95

service weapon was neither available for use nor was it used in the murder; it had absolutely no spatial or temporal relationship to the discrete crime charged; it had no purpose related to the crime charged. See Williams v. State, 622 So. 2d 456 (Fla. 1993) (finding it error to enhance defendant's sentence pursuant to sections 775.087(1)-(2), where facts showed the defendant was in Miami at the time the crimes in Pensacola were committed by his cohorts, thus the State consequently failed to show that the defendant had actual physical possession of a firearm during the commission of the crime); Lemus, 33 So. 3d at 776. The "carrying" element present in Connolly's case was only applicable to a charge for which he has been acquitted. I can find no case law interpreting section 775.087(1) that would apply to the facts presented in this case, and find, however, much case law to go against the majority's contortion of the application of section 775.087(1) to fit these facts.

**6) The jury verdict fails to support reclassification.**

The State argues that the verdict did, in fact, find Connolly guilty of second-degree murder "with a firearm," satisfying State v. Overfelt, 457 So. 2d 1385 (1984). This argument fails because that phrase is a reference to the murder weapon, not Connolly's service weapon. The jury verdict does not find that Connolly actually carried, displayed, used, threatened, or attempted to use a second firearm (i.e., his service weapon) during the commission of the murder. The words, "with a firearm" in the verdict form are not decisive to reclassification because "with a firearm"

merely duplicates the language of the indictment, and refers only to the manner in which Callahan was killed. See Roberts v. State, 923 So. 2d 578 (Fla. 5th DCA 2006) ("The jury expressly found that Roberts carried, used, threatened to use, or attempted to use a weapon in committing both crimes. This is exactly what is required for reclassification . . . under section 775.087(1)"); Streeter v. State, 416 So. 2d 1203, 1206 (Fla. 3d DCA 1982).

In this multiple defendant scenario, the jury verdict is fundamentally flawed because, 1) the indictment did not specifically charge Connolly, one of four equally charged co-defendants, with actually carrying, displaying, using, threatening, or attempting to use, a second firearm during the shooting of Callahan; 2) Connolly's service weapon was unrelated to the actual commission of the murder; 3) the "carried a firearm" aspect of Connolly's involvement with the co-defendants was only applicable to the ongoing criminal conspiracy alleged in Count 2, of which he was acquitted; and  4) the jury's verdict fails to specify that Connolly – among the four co-defendants – carried, displayed, used, or threatened to use a separate, uncharged, weapon during the act of second-degree murder.  As noted in Streeter, 416 So. 2d at 1206,

> If the State seeks to have a defendant's crime upwardly reclassified and his sentence thus enhanced because a weapon was used, it is incumbent upon it to see that the verdict forms pertaining to any count susceptible to reclassification under Section 775.087 contain the required additional finding that the defendant **committed the crime in a manner prohibited by the reclassification statute**.

97

(emphasis added).  And, as the Florida Supreme Court held in <u>Overfelt</u>, 457 So. 2d at 1385,

> Before a trial court may enhance a defendant's sentence for use of a firearm, the jury must make a finding that the defendant committed the crime while using a firearm either by finding him guilty of a crime which involves a firearm or by answering a specific question of a special verdict form so indicating.

This crime may have "involved a firearm," as <u>Overfelt</u> indicated, but it was not the firearm contemplated by either the verdict form or the State's theory of reclassification.

**CONCLUSION**

Under the factual and legal circumstances presented in this case, which all parties agree is a case of first impression, Connolly's conviction for second-degree murder with a firearm should not have been reclassified to a life felony in order to circumvent the statute of limitation on the underlying first-degree felony.  Without the fundamentally erroneous reclassification, the first-degree felony of second-degree murder was time-barred.  I strenuously dissent from the majority's new and unprecedented expansion of the application of section 775.087(1) to apply to a weapon not charged in the indictment or information, and spatially and temporally unrelated to the actual offense charged.

The majority has by its opinion so broadened the interpretation of section

775.087(1) in our district as to be in direct conflict with case authority from other Florida district courts of appeal and the Florida Supreme Court. Introducing this unprecedented and novel application of the statutory language of reclassification into Florida criminal jurisprudence will, quite predictably, confuse legal outcomes in criminal cases in Florida into the future.

Finally, I would certify the following question to the Florida Supreme Court as a matter of great public importance, in order to resolve the apparent conflict between the majority's interpretation of section 775.087(1) and the interpretation and application of that statute in the controlling authority of State v. Rodriguez, and related cases:

> Does section 775.087(1) allow reclassification of a conviction where "**during the commission of such a felony the defendant carries, displays, uses, threatens, or attempts to use any weapon or firearm**" and that firearm or weapon is uncharged, and is unrelated to the commission of the crime and/or is spatially and temporally distant from the crime?

SHEPHERD and LAGOA, JJ., concur.

EMAS, J., concurs in result.

EMAS, J., concurring in part and dissenting in part.

I concur in Parts I through IV of the majority opinion. However, I do not agree with the analysis, or the result reached, in Part VI[26] and, therefore, dissent from that portion of the majority opinion. Because my analysis of the issue in Part VI is dispositive of this appeal,[27] I conclude that we must reverse with directions to vacate the judgment and sentence and enter a judgment of acquittal.

## A. Introduction

The majority opinion frames the issue in Part VI as follows:

**Reclassification of the second degree murder was lawful because the State presented evidence and the jury found that the defendant personally carried a firearm during his role as a "principal in the first degree" to second degree murder**

However, in determining whether the second-degree murder offense in this

---

[26] Because portions of the majority's analysis in Part V and Part VII are intertwined with its discussion and analysis in Part VI, I also dissent from the overlapping portions of Parts V and VII.

[27] The issue of reclassification is dispositive because, without reclassification, the defendant's conviction as a principal to second-degree murder is a first-degree felony. At the time of this offense (1982), the statute of limitations for a first-degree felony was four years. See § 775.15(2)(a) Fla. Stat. (1982). The statute was subsequently amended and now provides that prosecution of a capital felony, a life felony or a "felony that resulted in death may be commenced at any time." See § 775.15(1), Fla. Stat. (2015).

100

case may lawfully be reclassified, the dispositive question is:

**Did Connolly carry a firearm "during the commission of" the murder?**

This question requires us to determine whether, under the language of the reclassification statute and in light of the evidence in this case, Connolly's second-degree murder as principal can properly be reclassified for carrying a firearm, where:

1.  Connolly carried a firearm in Boston when he met with, and aided and abetted, others who actually committed the murder;
2.  The murder was committed three weeks later in Miami; and
3.  Connolly was neither actually nor constructively present when others committed the murder.

### B. The Relevant Statutes

To answer the dispositive question, we must construe the relevant language of the reclassification statute, section 775.087(1), Florida Statutes (1981), and its interplay with the principal statute, section 777.011, Florida Statutes (1981).

The reclassification statute (section 775.087(1)) provides in pertinent part:

**775.087. Possession or use of weapon; aggravated battery; felony reclassification; minimum sentence**

(1) Unless otherwise provided by law, whenever a person is charged with a felony, except a felony in which the use of a weapon or firearm is an essential element, and **during the commission of such felony** the **defendant carries**, displays, uses, threatens to use, or attempts to use any weapon or **firearm**, or during the commission of such felony the defendant commits an aggravated battery, the felony for which the

person is charged shall be reclassified as follows:

(a) In the case of a felony of the first degree, to a life felony.

(Emphasis added.)

The principal statute (section 777.011) provides:

### 777.011. Principal in first degree[28]

Whoever commits any criminal offense against the state, whether felony or misdemeanor, or **aids, abets, counsels, hires, or otherwise procures such offense to be committed**, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the

---

[28] The common law provided for different classifications of perpetrators depending on their level of participation in the offense. At common law, there existed principals in the first degree (those who actually commit the offense); principals in the second degree (those who are present, aiding and abetting at the commission of the offense); accessories before the fact (those who, though absent at the time of the commission of the felony, did procure, counsel, command, and abet another to commit such felony); and accessories after the fact (those who, knowing a felony has been committed by another, thereafter receives or assists the felon). See generally, Potts v. State, 430 So. 2d 900 (Fla. 1982); Blackburn v. State, 314 So. 2d 634 (Fla. 4th DCA 1975). In 1957, the Florida Legislature eliminated such distinctions (except for accessory after the fact, which still exists, see § 777.03, Fla. Stat. (1981); Staten v. State, 519 So. 2d 622 (Fla. 1988)). Under section 777.011, all participants who either commit the offense themselves, or who aid, abet counsel, hire or otherwise procure such offense to be committed by another, are all considered principals in the first degree and are equally criminally responsible for the acts of their co-principals. I do not dispute that Connolly is equally culpable, as a principal in the first degree, for the second-degree murder committed by the other co-principals. But that is decidedly not the issue here. Rather, the issue is whether that second-degree murder, for which Connolly is equally criminally culpable, can be reclassified to a life felony. This requires a separate determination of whether, under the facts of this case and the statutory language, Connolly carried a firearm "during the commission of" the second-degree murder.

commission of such offense.

(Emphasis added.)

## C. **The Question Presented:  Did Connolly carry a firearm "during the commission of" the murder?**

The question for our determination: Does Connolly's carrying of a firearm at a meeting with co-defendants in Boston, during which he aided and abetted the murder committed by others three weeks later in Miami (while Connolly was in Boston), satisfy the statutory language authorizing reclassification of an offense when a defendant carries a firearm "during the commission of" the felony?

Under the majority's analysis, reclassification is authorized under the statute because:

● Connolly met with Bulger and Flemmi in Boston three weeks before the murder, which was committed in Miami;

● During the meeting, Connolly discussed, and helped to plan, the murder actually committed by Bulger and Flemmi (and Martorano) three weeks later in Miami;

● During this meeting with Bulger and Flemmi, Connolly carried a firearm; and

● Connolly's act of aiding and abetting constituted a part of the acts or series of acts of the second-degree murder, making Connolly guilty as an active co-perpetrator of, and not simply a principal to, the murder.

Therefore, the majority concludes, Connolly carried a firearm "during the commission" of the second-degree murder.  I do not agree that the act of Connolly—

103

episodically remote in both place and time from the commission of the murder by others—took place "during the commission of" the murder, nor do I agree that the act of Connolly constitutes part of the "series of acts" as defined by the second-degree murder statute, such that Connolly can be deemed an active co-perpetrator of, as opposed to a principal to, the murder.

### 1. Under the plain language of the reclassification statute, the carrying of the firearm did not occur "during the commission of" the felony.

Because this is an issue of statutory construction, I begin by reviewing the statutory language; if the language is plain and unambiguous, it is unnecessary to resort to rules of statutory construction. Daniels v. Fla. Dep't of Health, 898 So. 2d 61, 64 (Fla. 2005). Further, even if I were to conclude that the relevant language is ambiguous and reasonably subject to differing constructions,[29] the rule of lenity requires that we construe it in favor of the defendant. § 775.021(1), Fla. Stat. (1981); Houck v. State, 634 So. 2d 180, 182 (Fla. 5th DCA 1994); Willingham v. State, 541 So. 2d 1240, 1242 (Fla. 2d DCA 1989).

I conclude that there is no ambiguity in the language of the reclassification statute and that, giving the words of the statute their plain and ordinary meaning, the offense in this case is not subject to reclassification. The statute does not define the

_____

[29] A statutory provision is not ambiguous if it is "'plain to anyone reading the Act' that the statute encompasses the conduct at issue." Salinas v. U.S., 522 U.S. 52, 60 (1997).

phrase "during the commission of" the felony, nor is this phrase defined elsewhere in Florida's statutes.[30]  However, a similar phrase—"in the course of committing" a felony—is used and defined in several other statutory provisions.[31]

For example, statutes proscribing the crimes of robbery, robbery by sudden snatching and carjacking each provide that the offense shall be classified as a higher-degree offense if "in the course of committing" the crime the offender carries a firearm or deadly weapon.  See §§ 812.13(2)(a), 812.131(2)(a), 812.133(2)(a), Fla. Stat. (2015).  Each of these statutes define the phrase "in the course of committing" uniformly:

---

[30] Other statutes utilize the phrase "during the commission of" the offense but similarly fail to include any definition.  See, e.g., § 775.087(2)(a), Fla. Stat. (2015) (providing mandatory minimum sentences for persons who commit certain designated offenses and who "during the commission of the offense" actually possess a firearm or destructive device); § 784.07(3), Fla. Stat. (2015) (providing mandatory minimum sentence for any person who commits battery on a law enforcement officer and possessed a firearm "during the commission of the offense"); § 794.0115, Fla. Stat. (2015) (providing mandatory minimum sentence if the offender "used or threatened to use a deadly weapon during the commission of" certain designated offenses); § 810.09, Fla. Stat. (2015) (classifying trespass as a third-degree felony if the offender "is armed with a firearm or other dangerous weapon during the commission of the offense"); § 843.08, Fla. Stat. (reclassifying false personation of a law enforcement officer to a second-degree felony if the person "falsely personates any such officer during the course of the commission of a felony").

[31] Additionally, and as discussed *infra* at C.6, section 775.087(2)(a)2. (the 10/20/Life statute) uses a similar (but undefined) phrase in authorizing the imposition of minimum mandatory sentences where a firearm is discharged "during the course of the commission of" the felony.

> An act shall be deemed "in the course of committing the robbery" if it occurs in an attempt to commit robbery or in flight after the attempt or commission.

§ 812.13(3)(a), Fla. Stat. (2015).

> An act shall be deemed "in the course of committing a robbery by sudden snatching" if the act occurs in an attempt to commit robbery by sudden snatching or in fleeing after the attempt or commission.

§ 812.131(3)(a), Fla. Stat. (2015).

> An act shall be deemed "in the course of committing the carjacking" if it occurs in an attempt to commit carjacking or in flight after the attempt or commission.

§ 812.133(3)(a), Fla. Stat. (2015).

As a final example, Chapter 810, Florida Statutes, proscribes the crime of burglary, and classifies a burglary as a higher-degree offense if "in the course of committing the offense" the offender is or becomes armed, or commits an assault or battery. See § 810.02(2)(a)-(b), Fla. Stat. (2015). The statutory definition of "in the course of committing" is identical to the corresponding provisions of the robbery and carjacking statutes:

> An act is committed "in the course of committing" if it occurs in an attempt to commit the offense or in flight after the attempt or commission.

§ 810.011(4), Fla. Stat. (2015).

It is difficult to conceive how the phrase "during the commission of" a crime can be construed more broadly than the phrase "in the course of committing" a

106

crime.[32]  In fact, one might cogently argue that the undefined phrase "during the commission of" should be read more <u>narrowly</u> than the defined phrase "in the course of committing."  However, even if we equate the two phrases and construe the phrase "during the commission of" the murder to mean "an act which occurs in an attempt to commit [murder] or in fleeing after the attempt or commission [of the murder,]" it is evident that Connolly's carrying of the firearm did not occur "during the commission of" the murder, and his conviction for second-degree murder cannot be reclassified.

It is important to note that the reclassification statute is not limited to situations in which a defendant <u>carries</u> a firearm during the commission of felony; there are several different acts which, if undertaken during the commission of the felony, will subject a defendant's offense to reclassification.  Specifically, the statute authorizes reclassification of an offense for a defendant who:

1. "During the commission of" the felony:

    a. <u>Carries</u> any weapon or firearm;

---

[32] Even the majority agrees that the two phrases are synonymous, positing that the phrase "during the commission of" the crime should be defined as "at some time in the course of" the commission of the crime.  <u>See</u> majority op. at 41.  Unfortunately, the majority's analysis focuses on the words "at some time" (apparently equating it with an open-ended timeframe, untethered to time or place) and ignores the truly relevant portion: "in the course of," which connotes an episodic relationship between the carrying of the firearm and the commission of the crime.

b. <u>Displays</u> any weapon or firearm;

c. <u>Uses</u> any weapon or firearm;

d. <u>Threatens to use</u> any weapon or firearm; or

e. <u>Attempts to use</u> any weapon or firearm.

2. "During the commission of" the felony "<u>commits an aggravated battery</u>." <u>See</u> § 775.087(1), Fla. Stat. (1981).

Each of these acts forms an independent basis for reclassification and all are contained within the very same clause of the very same subsection of the reclassification statute. These words and phrases must be read together and construed in a manner to make them compatible and not contradictory, giving meaning to the entire statute and each word within it. <u>Fla. Dep't of Envtl. Protection v. ContractPoint Fla. Parks, LLC</u>, 986 So. 2d 1260, 1265 (Fla. 2008). There is nothing in the reclassification statute to indicate that the phrase "during the commission of" a crime includes a principal whose carrying of a firearm is temporally and spatially remote from the actual commission of the crime. The Florida Legislature could have expressly authorized reclassification of an offense for a defendant who carries (or displays, uses, threatens to use, or attempts to use) a firearm "during the commission of <u>or while aiding and abetting the commission of</u>" an offense. In fact, the Legislature did precisely that in enacting certain forfeiture

108

legislation. <u>See e.g.,</u> § 932.701(2)(a), Fla. Stat. (2015)[33]; § 831.033, Fla. Stat. (2015).[34] Given the language employed in these statutes, it is evident that the

---

[33] § 932.701 provides in pertinent part:

(2) As used in the Florida Contraband Forfeiture Act:
(a) "Contraband article" means:
. . . .
5. Any personal property, including, but not limited to, any vessel, aircraft, item, object, tool, substance, device, weapon, machine, vehicle of any kind, money, securities, books, records, research, negotiable instruments, or currency, which was used or was attempted to be **used as an instrumentality in the commission of, or in aiding or abetting in the commission of, any felony**, whether or not comprising an element of the felony, or which is acquired by proceeds obtained as a result of a violation of the Florida Contraband Forfeiture Act.

6. Any real property, including any right, title, leasehold, or other interest in the whole of any lot or tract of land, which was used, is being used, or was attempted to be **used as an instrumentality in the commission of, or in aiding or abetting in the commission of, any felony**, or which is acquired by proceeds obtained as a result of a violation of the Florida Contraband Forfeiture Act.
. . . .

12. Any personal property, including, but not limited to, any vehicle, item, object, tool, device, weapon, machine, money, security, book, or record, that is used or attempted to be **used as an instrumentality in the commission of, or in aiding and abetting in the commission of, a person's third or subsequent violation** of s. 509.144, whether or not comprising an element of the offense.

(Emphasis added.)

[34] § 831.033(1)(b) provides for the forfeiture of certain counterfeit property:

109

Legislature recognizes the distinction between a firearm that is used "during the commission of" a felony and a firearm that is used "during the aiding and abetting in the commission of" a felony.

**2.   How could Connolly have carried a firearm "*during the commission of*" the murder if Connolly did not commit the murder and was not actually or constructively present when the murder was committed by others?**

Given the plain language of the principal statute, it is clear that Connolly can be held equally culpable with his co-principals <u>for the second-degree murder</u>, because he intended that the murder be committed and he did some act to aid and abet other persons who actually committed the crime.  The principal statute provides:

> Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree and may be charged, convicted, and punished as such, whether he or she is or is not actually or constructively present at the commission of such offense.

§ 777.011, Fla. Stat. (1981).  These requirements are echoed in the case law and in the standard jury instructions.  <u>See</u> <u>Potts v. State</u>, 430 So. 2d 900 (Fla. 1982); <u>State</u>

---

 (b) Any personal property, including, but not limited to, any item, object, tool, machine, or vehicle of any kind, **employed as an instrumentality in the commission of, or in aiding or abetting in the commission of, the crime of counterfeiting**, as proscribed by ss. 831.03-831.034, and not otherwise included in paragraph (a), may be seized and is subject to forfeiture pursuant to ss. 932.701-932.704.

v. Roby, 246 So. 2d 566 (Fla. 1971); Barron v. State, 990 So. 2d 1098 (Fla. 3d DCA 2007); Fla. Std. J. Inst. (Crim.) 3.5(a).[35]

Connolly's act of aiding and abetting makes him equally criminally responsible for the second-degree murder, and the principal statute expressly provides that Connolly need not have been actually or constructively present to be deemed equally culpable for the murder. But his culpability for the murder under the principal statute is far different from the question of whether his carrying of the firearm "during the commission of the felony" requires his actual or constructive presence. We must therefore separate the issue of presence for culpability as a principal from the issue of presence for reclassification purposes. Under the principal statute (§ 777.011), a person may be found guilty if he either:

---

[35] The standard jury instruction on principals, Fla. Std. J. Inst. (Crim.) 3.5(a), provides:

> If the defendant helped another person or persons [commit] [attempt to commit] a crime, the defendant is a principal and must be treated as if [he] [she] had done all the things the other person or persons did if:

> 1. the defendant had a conscious intent that the criminal act be done and

> 2. the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise **the other person or persons to actually [commit] [attempt to commit] the crime**.

> To be a principal, the defendant does not have to be present when the crime is [committed] [or] [attempted].
> (Emphasis added.)

111

"commits any criminal offense;"

or

"aids, abets, counsels, hires, or otherwise procures such offense to be committed."

It is beyond peradventure that the State prosecuted this case not upon a theory that Connolly committed the murder himself, but rather that Connolly was equally criminally responsible as if he committed the murder because he aided, abetted, counseled, hired or otherwise procured such offense "to be committed" by others.[36] The clear language of the principal statute establishes that, under this theory, a principal is not one who himself "commits any criminal offense" but rather is one who "aids, abets, counsels, hires, or otherwise procures such offense to be committed" by another.

The trial court correctly instructed the jury that, in order to find Connolly guilty of murder under the principal theory, the State had to prove that he "had a

---

[36] I discuss *infra*, at section C.6, the majority's characterization of Connolly as an active co-perpetrator of the murder itself, rather than one whose equal culpability is as a principal who aided and abetted those who actually committed the murder. However, it is worth noting here that at no time during the pretrial, trial or post-trial proceedings below, or on appeal, has the State ever taken the position that Connolly's culpability for the murder was as an active co-perpetrator who himself committed the murder. The State has always based its prosecution on a principal theory. The majority's opinion on rehearing en banc marks the birth of this "active co-perpetrator" theory and, given that no party has ever raised or argued such a theory, appears to be the result of an immaculate conception.

112

conscious act that the criminal act be done" and he "did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise **the other person or persons to actually commit. . . the crime.**" Fla. Std. J. Inst. (Crim.) 3.5(a) (emphasis added). Thus, Connolly's criminal responsibility for the murder was necessarily premised upon the fact that the crime was <u>actually committed by someone other than Connolly</u>.

It is in this context that we examine the reclassification statute. Before the crime of second-degree murder can be reclassified to a life felony, it must be established that Connolly carried a firearm "during the commission of" the murder. But how can one logically conclude that Connolly carried a firearm *during the commission of the murder* where: the murder was "actually committed" by others; Connolly was not present (actually or constructively) when the murder was actually committed by others; and Connolly's carrying of the firearm occurred three weeks before the actual commission of the murder by others?

The fact that Connolly was not actually or constructively present is concededly irrelevant to his <u>conviction</u> as a principal to second-degree murder. However, I conclude Connolly's second-degree murder conviction as a principal cannot be <u>reclassified</u> under section 775.087(1) because he did not carry use, display, threaten to use, or attempt to use any weapon or firearm while actually or

113

constructively present during the commission of the offense.[37]   Stated another way, I cannot agree that Connolly carried a firearm "during the commission of" the murder and therefore conclude that his conviction as principal to second-degree murder is not subject to reclassification.

### 3.  The majority's construction of the reclassification statute would lead to absurd results.

Any reasonable and contextual reading of the statutory language leads inexorably to the conclusion that the acts committed by Connolly in this case do not fall within the ambit of the reclassification statute.  However, even if one could conclude that the statutory language is ambiguous and subject to differing constructions, rules of statutory construction require that we construe the language in such a way as to avoid an absurd result.  Thompson v. State, 695 So. 2d 691 (Fla. 1997).  The majority's expansive construction of the phrase "during the commission of" would indeed lead to unreasonable and absurd results when applied to other circumstances.[38]

---

[37]This conclusion does not impact the reclassification or enhancement of accomplices or aiders and abettors who are armed and actually or constructively present during the actual commission of the offense.  Application of the reclassification statute under such circumstances is well-established and is unaffected by my analysis.  See e.g., Junco v. State, 510 So. 2d 909 (Fla. 3d DCA 1987); Gillis v. State, 486 So. 2d 706 (Fla. 5th DCA 1986); Smith v. State, 438 So. 2d 10 (Fla. 2d DCA 1983).

[38] The majority posits that the Legislature has expressed its intent that the maximum punishment be imposed for people who possess a firearm during the commission of criminal offenses, relying upon the legislative intent contained in section 27.366,

If, as the majority concludes, Connolly's actions as principal in the instant case fall within the ambit of the reclassification statute, so too would the actions of the hypothetical Principal in the following scenarios. Note that in each of these scenarios (as in the instant case) the co-principal commits the murder three weeks later, and the Principal is not actually or constructively present at the murder:

- **"Carries" or "uses" a weapon "during the commission of" the murder**

  Principal and co-principal meet at a restaurant. Principal orders steak, and when the waiter brings the steak, Principal pulls a ten-inch hunting knife out of his pocket and uses it to cut his steak while encouraging co-principal to commit the murder. Under the statutory language as construed by the majority, Principal's conviction for second-degree murder may be reclassified because "during the commission of" the felony, Principal "carries" or "uses" a weapon (i.e., the hunting knife to cut his steak).

- **"Threatens to use" a weapon "during the commission of" the murder**

  During that same dinner, and while Principal is encouraging co-principal to commit the murder, Principal gets angry at one of the waiters, raises his hunting knife and yells at the waiter "I will cut you with this knife if you don't bring us some more bread." Under the

---

Florida Statutes. <u>See</u> majority op. at 58-59. There are two flaws with this position: first, section 27.366 was enacted in 1999, eighteen years after John Callahan was murdered. Second, and as even the majority concedes, section 27.366, makes no reference whatsoever to the reclassification subsection (775.087(1)), limiting its expressed legislative intent to the minimum mandatory subsections of section 775.087 (§§ 775.087(2) and (3)). As the majority asserts elsewhere in its opinion, we must presume that "the Legislature chose its words carefully when drafting" section 27.366

statutory language as construed by the majority, Principal's conviction for the second-degree murder may be reclassified because "during the commission of" the felony, Principal "threatens to use" a weapon (though the threat is made three weeks before the murder is committed, and is directed not at the intended victim of or a bystander to the murder, but rather at the waiter).

### ● "Threatens to use" a firearm "during the commission of" the murder

During that same dinner, and while Principal is encouraging co-principal to commit the murder, Principal says: "I've never owned a gun, but if you don't go and kill him, I'm going to go buy a gun and kill him myself." Under the statutory language as construed by the majority, Principal's conviction for second-degree murder may be reclassified because "during the commission of" the second-degree murder, Principal "threatens to use" a firearm (though the threat is made three weeks before the murder is committed, and is directed not at the intended victim or a bystander of the murder, but at the co-principal).

### ● "Commits an aggravated battery" "during the commission of" the murder

During that same dinner, and while Principal is encouraging co-principal to commit the murder, Principal gets in a fight with the waiter and kicks the waiter in the head, causing permanent injury. Under the statutory language as construed by the majority, Principal's conviction for second-degree murder may be reclassified because "during the commission of" the second-degree murder, Principal "commits an aggravated battery."

### ● "Uses" a firearm "during the commission of" the murder

Principal and co-principal hold their meeting at a gun range. Principal is taking target practice (using a gun provided by the range) while encouraging co-principal to commit the murder. Under the statutory language as construed by the majority, Principal's conviction for

116

second-degree murder may be reclassified because "during the commission of" the second-degree murder, Principal "uses" a firearm. (Of note, under the majority's analysis, Principal would also be subject to a 20-year mandatory minimum under section 775.087(2)(a)2. (the "10/20/Life" statute) because "during the course of the commission of" the murder, Principal "discharged a firearm.")

### ● "Displays" a firearm "during the commission of" the murder

Principal and co-principal hold their meeting at Principal's house. While encouraging co-principal to commit the murder, Principal shows off a Winchester rifle displayed above his fireplace. Co-principal admires it and Principal takes it out of the display case and lets co-principal hold it in his hands. Under the statute as construed by the majority, Principal's conviction for second-degree murder may be reclassified because "during the commission of" the second-degree murder, Principal "displays" a firearm.[39]

These scenarios expose the infirmity in the majority's construction of the reclassification statute. I conclude that there must be some episodic connection—a temporal and spatial relationship—between the act (carry, display, use, threaten to use, or attempt to use a firearm or weapon) and the commission of the underlying offense. Construing the phrase "during the commission of" the murder as the majority proposes would lead to absurd results such as those described above. A plain and common-sense reading of the reclassification compels the conclusion that Connolly did not carry a firearm "during the commission of" the murder.

---

[39] Notably, co-principal's conviction may also be reclassified because "during the commission of" the second-degree murder, co-principal "carried" a firearm. This is so even if the actual murder was accomplished without anyone using or possessing a firearm.

117

**4. The majority's analysis requires a conclusion that the commission of the second-degree murder "began" during the meeting in Boston.**

While not directly addressing the issue, the majority's analysis implicitly requires us to answer this question as well: When did the commission of the second-degree murder **begin**? According to the majority, the commission of the second-degree murder necessarily "began" in Boston during the meeting between Connolly and his cohorts. This must be the majority's conclusion, for it is the only way they can shoehorn their conclusion that Connolly's carrying of the firearm occurred "during the commission" of the murder. In other words, the majority asserts that Connolly's acts at that meeting constituted part of the actual commission of the second-degree murder (rather than acts of aiding and abetting making him equally responsible as a principal to the murder subsequently committed by others). The majority's assertion is flawed, however. While the planning and preparation for the murder certainly began at this meeting, the commission of the murder did not "begin" during this meeting. Connolly's acts at that meeting are not the commission of the second-degree murder, and therefore his carrying of the firearm during this meeting did not occur "during the commission of" the murder.

Perhaps the most effective way to analyze this aspect of the majority's position is by considering the following: If in fact this meeting marks the "beginning" of the commission of the murder, and had the murder not been consummated, then it must follow that Connolly could have been convicted of

118

attempted second-degree murder based simply on his acts which took place at that meeting with his co-defendants. In other words if, as the majority asserts, Connolly's acts at that meeting (followed by the subsequent commission of the murder) means he is guilty as one who himself "committed the murder," then his acts at that meeting (followed by a failure to consummate the murder) would have supported his conviction for attempted second-degree murder.

By looking at it in this fashion, and analyzing relevant case law regarding criminal attempts, one can readily conclude that the majority's analysis is bereft of support. While Connolly's acts and meeting with his co-principals might well have supported a conviction for solicitation or conspiracy (see discussion *infra*), his acts and meeting with his co-principals surely could not support a conviction for attempted second-degree murder, because his acts consisted of mere planning and preparation.

An attempt to commit a crime requires proof of two elements: a specific intent to commit the crime, and an overt act, beyond mere preparation, done towards its commission, but falling short of consummation of the crime. Gustine v. State, 97 So. 207, 208 (Fla. 1923); State v. Coker, 452 So. 2d 1135 (Fla. 2d DCA 1984). There is little doubt that Connolly had the specific intent to commit the crime of murder. However, there is no evidence that he "did some act toward committing the crime of [murder] that went beyond just thinking or talking about it." Fla. Std. J. Inst. (Crim.)

119

5.1.    Therefore, Connolly's intent that the murder take place, while clearly established, is insufficient to allow one to conclude that the commission of the crime had begun.  There must be proof of an overt act beyond mere preparation:

> The intent to commit a crime standing alone does not amount to an attempt nor is preparation alone sufficient. The overt act must reach far enough towards the accomplishment of the desired result to amount to a commencement of the consummation. There must be some appreciable fragment of the crime committed and it must be in such progress that it would be consummated unless interrupted by circumstances independent of the will of the attempter.

Robinson v. State, 263 So. 2d 595, 596-97 (Fla. 3d DCA 1972).

The meeting, held three weeks before the murder, consisted of planning and preparation, acts which are insufficient to establish the commencement of the crime:

> Preparation generally consists of devising or arranging the means or measures necessary for the commission of the offense. The attempt is the direct movement toward the commission after preparations are completed. 21 AM.JUR.2d Criminal Law § 159 (1981). The act must reach far enough toward accomplishing the desired result to amount to commencement of the consummation of the crime. Some appreciable fragment of the crime must be committed and it must proceed to the point that the crime would be consummated unless interrupted by a circumstance independent of the attemptor's will. Robinson v. State, 263 So.2d 595 (Fla. 3d DCA 1972); Groneau v. State, 201 So.2d 599 (Fla. 4th DCA), cert. denied, 207 So.2d 452 (Fla.1967). The act need not be, however, the ultimate, the last proximate, or the last possible act toward consummation of the crime. State v. Thomas, 438 S.W.2d 441 (Mo.1969).

Coker, 452 So. 2d at 1136-37.[40]

---

[40] It seems appropriate to note here that I do not ascribe to any "last act" theory which the majority appears to assign to my dissent.  I do not contend that because Connolly

In Arias v. State, 593 So. 2d 260 (Fla. 3d DCA 1992), the defendant, a director of nursing, was charged with attempted first-degree murder. The State's evidence established that an infant was born with severe birth defects and placed under the supervision of Arias and other nurses, who regularly administered pain-killing medication to ease the child's suffering. Arias contacted and met with Judy Felsenstein, a nurse under Arias' supervision. The two discussed a plot to kill the child by administering an overdose of pain medication. Arias later brought Etiole Means into the scheme. Means and Arias knew each other and had previously worked together. The three of them met and together discussed the details of their plan to kill the child. Arias told Felsenstein and Means that the child's grandfather was aware of the plan and had approved it. Means was required to apply for a temporary nursing position with Arias' company. After Means was hired for the position, Arias gave Means a bottle of medication which was to be administered to the child in a lethal dose. Ultimately, Means did not carry out the plot, and instead went to the police and confessed.

Arias was charged with and convicted of, *inter alia*, attempted first-degree

---

was not present for, and did not carry the firearm during, the very final act of the murder (i.e., the shooting of the firearm by a co-defendant) that he cannot be reclassified. To the contrary, so long as it can be said that he carried a firearm "during the commission of" the murder, he is subject to reclassification, whether the carrying of the firearm occurred at the beginning of the commission of the murder, or at the end of the commission of the murder, or at any time in between.

murder. On appeal, Arias argued that the evidence was legally insufficient to support

the attempted murder conviction. This Court agreed:

> In this case, the state presented evidence which showed that Arias met with Means and Felsenstein, discussed the murder plot, and then gave Means the bottle of Hycomine. The plot to kill the child went no further. The discussions occurred four days before the murder was to take place. Means testified that she had not decided to help Arias kill the child and Means never took any active steps toward completion of the crime. The evidence shows that the acts committed by Arias were only those of preparation to commit the crime and did not rise to the level of overt acts nearing consummation of the crime. Therefore, the evidence was not sufficient to sustain a verdict of attempted first degree murder. See Robinson; see also Gervin v. State, 212 Tenn. 653, 371 S.W.2d 449 (1963) (defendant's hiring and attempt to persuade person to commit murder amounted to mere preparation only and was not an attempt to commit first degree murder). The murder conviction is therefore reversed.

Id. at 263.

In the instant case, the "acts" engaged in by Connolly, at a meeting with his

co-defendants three weeks before the murder, were not acts which "reach far enough

toward accomplishing the desired result to amount to commencement of the

consummation of the crime." Coker, 452 So. 2d at 1136. The acts engaged in by

Connolly fall far short of those found insufficient in Arias. Connolly's acts were

simply preparatory, consisting of "devising or arranging the means or measures

necessary for the commission of the offense." Coker, 452 So. 2d at 1136. See

also Morehead v. State, 556 So. 2d 523, 525 (Fla. 5th DCA 1990) (defendant

prisoner was convicted of attempted escape, upon State's evidence that defendant

122

committed overt acts in furtherance of the crime by 1) intentionally cutting himself to obtain medical treatment at an off-site facility where he hoped his girlfriend would meet him and help him make good his escape; and 2) causing a confederate to introduce a gun onto the prison grounds for defendant's use to assist in his escape. Conviction reversed, holding "neither act amounted to an overt act beyond mere preparation.").

While the acts of Connolly were certainly sufficient to make him a principal to the murder subsequently committed by others, and thus equally responsible as if he had committed the murder himself, Connolly's acts most assuredly did not constitute the beginning of the commission of the second-degree murder, such that his carrying of a firearm could be said to have occurred "during the commission of" the murder. The majority's conclusion to the contrary flies in the face of well-settled case law and implicitly recedes from this Court's decisions in <u>Arias</u> and <u>Robinson</u>.

## 5. Distinguishing aiding and abetting from solicitation, conspiracy and possessory offenses.

The majority analogizes this case, and the offense, to cases that either expressly or implicitly authorize reclassification for possession of a firearm during the commission of a criminal conspiracy or a possessory offense. Such an analogy

123

is inapplicable for reasons that are further explained below.[41]   But the one distinguishing feature that separates the offense at hand from all of the other "analogous" offenses relied upon by the majority is this:  Connolly's act of aiding and abetting (i.e., the act during which he carried a firearm) was not charged as a separate and completed crime.  Connolly's criminal culpability as a principal did not materialize until the murder was committed or attempted.  See § 775.011, Fla. Stat. ("Whoever. . . aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed, is a principal in the first degree.").   There is no longer a crime of "aiding and abetting," in the absence of an attempted or committed criminal offense.  It is with this backdrop in mind that we review the application of the reclassification statute to other types or categories of offenses.

### a. Distinguished from solicitation

Connolly's act in this case consisted of aiding and abetting the actual perpetrators of the murder.  While this act could have subjected Connolly to prosecution for criminal solicitation, the State did not charge Connolly with such a crime.  The crime of criminal solicitation requires proof that:

1. Defendant solicited another to commit an offense; and

2. During the solicitation, defendant commanded, encouraged, hired or

---

[41] I also include a discussion of the crime of solicitation, as it helps to further demonstrate why the majority's analogy is misguided.

> requested another person to engage in specific conduct which would constitute the commission of the offense solicited or an attempt to commit the offense solicited.

See § 777.04(2), Fla. Stat. (1981). See also Fla. Std. J. Inst. (Crim.) 5.2. The solicited crime need not actually be committed, nor is it necessary that the defendant or the person solicited commit any act in furtherance of the offense solicited. Id. See also State v. Waskin, 481 So. 2d 492 (Fla. 3d DCA 1985); State v. Duque, 472 So. 2d 758 (Fla. 2d DCA 1985).[42] The crime of solicitation is complete when the defendant, with the intent that another person commit a crime, commands, encourages, hires or requests that person to commit a crime. Waskin, 481 So. 2d at 493. Had the State charged Connolly with criminal solicitation, and had the jury found him guilty of said crime, Connolly's carrying of a firearm during the completed criminal offense of solicitation, would presumably have authorized reclassification under section 775.087(1), because Connolly himself committed the acts constituting the criminal offense of solicitation and committed those acts while carrying a firearm. The crime of solicitation would have been complete upon his act of soliciting another to commit the crime, coupled with his intent that the crime be committed. However, Connolly was neither charged with nor convicted of armed

---

[42] It is the additional requirement of an overt act in furtherance that distinguishes the offenses of solicitation and conspiracy from the offense of criminal attempt. Waskin, 481 So. 2d at 494; State v. Johnson, 561 So. 2d 1321 (Fla. 4th DCA 1990); Hutchinson v. State, 315 So. 2d 546 (Fla. 2d DCA 1975).

125

solicitation.

This distinction between armed solicitation and "armed aiding and abetting" (a non-crime) reveals the shortcomings in the majority's position. Under the armed solicitation, Connolly's guilt is <u>not</u> premised upon a principal theory. The offense of solicitation would have <u>actually been committed</u> by Connolly himself and the crime would have been <u>complete</u> at the moment he solicited another to commit the crime with the intent that such crime be committed. If Connolly was carrying a firearm during this act (an act committed by Connolly himself and constituting a completed crime), reclassification would be authorized.

By comparison, in the instant case no crime was committed or completed upon Connolly's act of aiding and abetting (while carrying a firearm) three weeks before the murder. Connolly's criminal culpability as a principal to murder did not even come into existence until the murder was actually committed by others three weeks later. Unlike criminal solicitation, Connolly's act in this case did not constitute a completed crime committed by Connolly himself. Therefore, Connolly's act of carrying a firearm while aiding and abetting three weeks before the actual commission of the murder by others cannot be said to have occurred "during the commission of" the murder.

### b. Distinguished from conspiracy

Connolly was charged with (but acquitted of) conspiracy to commit murder.

126

His criminal culpability under the conspiracy charge is premised upon his direct participation in committing the crime of conspiracy to commit murder. Conspiracy requires the following two elements be proven:

1.  The defendant intended that the offense (which was the object of the conspiracy) be committed.

2.  In order to carry out that intent, the defendant agreed, conspired, combined, or confederated with others to cause the object of conspiracy to be committed either by them, or one of them, or by some other person.

See § 777.04(3), Fla. Stat. (1981); Fla. Std. J. Inst. (Crim.) 5.3. It is not necessary that the defendant do any act in furtherance of the offense conspired. Fla. Std. J. Inst. (Crim.) 5.3. See also State v. Burkett, 344 So. 2d 868 (Fla. 2d DCA 1977). The conspiracy is formed and a crime is "committed" and complete upon the occurrence of these two elements—the agreement coupled with the requisite intent. The completed crime of conspiracy is based upon the direct and active participation of the individual conspirators, and is implicitly not based on a principal theory.

Furthermore, even though a conspiracy crime may be complete upon the occurrence of the two elements described above, a conspiracy is also in the nature of a continuing offense, and "once the conspiracy is formed, a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence.'" Smith v. United States, 133 S.Ct. 714, 719 (2013) (quoting Hyde v. United States, 225 U.S. 347, 369 (1912)). Had the jury convicted

127

Connolly of conspiracy to commit murder, the fact that Connolly carried a firearm at any point during his membership in the conspiracy would appear to subject the offense to reclassification, because Connolly himself committed those acts which constitute the completed (and continuing) crime of conspiracy, and did so while carrying a firearm. See, e.g., Campbell v. State, 935 So. 2d 614 (Fla. 3d DCA 2006); Kennedy v. State, 564 So. 2d 1127, 1129 (Fla. 1st DCA 1990) (noting in *dicta* that co-conspirators who are armed while agreeing, conspiring, combining or confederating to cause the object of the conspiracy would be subject to reclassification).

### c. Distinguished from possessory offenses

Narcotics possession, and other "possessory" crimes, are in the nature of a continuing offense. For example, so long as a defendant is and remains in possession of cocaine, he is committing a crime. If at any point he is simultaneously in possession of cocaine and a firearm, the possessory offense (assuming it falls within the category of applicable offenses under the statute) may properly be reclassified. See, e.g., Menendez v. State, 521 So. 2d 210 (Fla. 1st DCA 1988); Smith v. State, 438 So. 2d 10 (Fla. 2d DCA 1983).

Offenses which are continuing in nature are to be distinguished from discrete offenses which are complete upon the commission of the elements of the crime. Illustrative of this distinction is Willingham v. State, 541 So. 2d 1240 (Fla. 2d DCA

128

1989). In that case, Willingham was charged with possession with intent to deliver cocaine and sale of cocaine. It was alleged that Willingham carried or used a firearm during the commission of these offenses. The evidence at trial established that Willingham and an accomplice sold cocaine to an undercover officer. The accomplice was in possession of a firearm during the transaction. After the sale was complete and the undercover officer began driving away, Willingham took the firearm from the accomplice and began shooting at the departing officer. Willingham was convicted of sale of cocaine with a firearm,[43] and the trial court reclassified Willingham's offense from a second-degree felony to a first-degree felony pursuant to section 775.087(1) on the basis that the defendant used a firearm "during the commission of" the offense of sale of cocaine. The Second District reversed, holding:

> In this instance, the sale of cocaine offense involved an exchange of the cocaine for money. This exchange, and therefore the offense, was completed before Willingham seized the gun and began shooting it. As such, it cannot be said that Willingham "carried or used" the gun *during* the commission of the sale offense.

Id. at 1242. The instant case presents the flip side of the same coin in Willingham. In that case, the defendant's conviction could not be reclassified because the firearm was possessed after, rather than during, the commission of the offense. Here, the

---

[43] He was also convicted of possession with intent to deliver cocaine without a firearm, but that conviction is not relevant to this issue.

129

defendant's conviction cannot be reclassified because the firearm was possessed <u>before</u>, rather than during, the commission of the offense.

### 6. Connolly was not a co-perpetrator of the actual murder, because his "act" as an aider and abettor was not imminently dangerous to another as required under the murder statute

In its final effort to support reclassification, the majority concludes that Connolly acted not merely as a principal but as an active co-perpetrator and that Connolly (as well as the co-defendants) <u>personally</u> "committed" the offense by aiding and abetting the eventual murder. This conclusion is unsupported by law and is not the theory or evidence upon which the State based its prosecution. Connolly was charged, prosecuted and convicted upon a theory (and upon evidence) that <u>he did not</u> actually commit the murder but aided and abetted others who did commit the murder and was therefore guilty as a principal. Under this theory and evidence, Connolly was equally criminally responsible <u>as if</u> he committed the murder, because he acted to aid or abet those who actually committed the murder. A review of the State's opening statements and closing arguments, the transcripts of hearings on pre-trial and post-trial motions, and the State's briefs on appeal, reveals one common theme: the State's unwavering position that Connolly was not the person who committed the murder, but that he was equally culpable for the murder as a principal. The State has never advanced the "active co-perpetrator" theory embraced by the

130

majority opinion.

Nevertheless, the majority opinion now characterizes Connolly's acts of aiding and abetting as part of a series of related acts that supports his conviction not merely as a principal responsible for the acts of others who committed the murder, but as an *active co-perpetrator of the murder itself*.[44] The majority's analysis, however, is flawed.

Certainly under the principal theory, the acts of others constitute the acts of Connolly and under that theory Connolly is equally criminally responsible for the acts of his co-defendants *as if* he had himself committed the murder. But it is just

_____

[44] The majority misses the point in asserting that the actual perpetrators of the crime, and aiders and abettors to the crime, are all now treated as principals under the law and may be charged, convicted and punished as such. See majority op. at 38. I have no quarrel with this accurate statement of the law, nor do I suggest that Connolly, who aided and abetted the crime, is in any way less culpable of the second-degree murder than those who actually committed the murder. But the issue at hand is not Connolly's culpability for the second-degree murder; rather, it is whether his conviction for that charge, as a principal who aided and abetted (but who did not himself commit) the murder, can be reclassified to a higher degree because he carried a firearm during his remote act of aiding and abetting. It is in this context that there is a relevant purpose in distinguishing between principals whose culpability is direct (i.e., those who actually committed the crime) and principals whose culpability is indirect (i.e., those who aided and abetted the crime and are therefore equally criminally responsible for the acts of their co-principals).
Based upon the faulty premise that Connolly's act is the "act of murder" (rather than the remote act of aiding and abetting the murder subsequently committed by others), the majority contends, in essence, that Connolly's culpability as principal was as an active perpetrator of the murder, therefore allowing for its *ipso facto* (but nevertheless wayward) conclusion that Connolly's carrying of the firearm occurred "during the commission of" the murder.

as clear that the "acts" constituting the crime of second-degree murder, as defined by the statute, the jury instructions, and the case law, were acts committed not by Connolly but by others. Connolly's own acts were not the acts of the murder such that he can be reclassified as an active co-perpetrator of the murder.

> Second-degree murder is defined in section 782.04(2), Florida Statutes (1981) as follows:

> The unlawful killing of a human being, when perpetrated by **any act imminently dangerous to another** and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, is murder in the second degree and constitutes a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

As the trial court correctly instructed the jury in this case, the offense of second-degree murder required the State to establish, inter alia, that "there was an unlawful killing of John Callahan by **an act imminently dangerous to another** and demonstrating a depraved mind without regard for human life." See Fla. Std. J. Inst. (Crim.) 7.4 (emphasis added). Importantly, that same jury instruction provides a definition of the underscored phrase:

> An act is "imminently dangerous to another and demonstrating a depraved mind" **if it is an act or series of acts that**. . . a person of ordinary judgment would know **is reasonably certain to kill** or do serious bodily injury to another. . . .

Fla. Std. J. Inst. (Crim.) 7.4. (Emphasis added.) See also State v. Montgomery, 39 So. 3d 252, 255 (Fla. 2010) (recognizing that the phrase "imminently dangerous to

132

another and evincing a depraved mind" is an act or series of acts which "a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another")(citations omitted). Coicou v. State, 39 So. 3d 237, 243 n.4 (Fla. 2010); Pressley v. State, 395 So. 2d 1175, 1177 (Fla. 3d DCA 1981).

The majority incorrectly concludes that Connolly's act of aiding and abetting satisfied this definition, determining that Connolly, by his actions, was "signing a death warrant for" Callahan. See majority opinion at 42. However memorable or accurate this description may be, it falls short of what the law requires. Second-degree murder does not require merely that the act led to Callahan's death, or was likely to result in Callahan's death. Rather, second-degree murder requires that **the act itself** (or the series of acts) must be "reasonably certain **to kill**. . . ." Montgomery, 39 So. 3d at 255 (emphasis added). The distinction between these concepts is not merely semantic. It represents the difference between the act of Connolly (remotely aiding, abetting, and assisting his co-defendants in a manner that was reasonably certain to **lead to Callahan's death**) and the act of Martorano (shooting Callahan in the back of the head with a firearm) that was reasonably certain **to kill**.

In Pressley, for example, this court held that "a person of ordinary judgment would know that firing a loaded gun toward a group of people is reasonably certain to kill or do serious bodily injury to another." Pressley, 395 So. 2d at 1177 (emphasis

133

added).  By contrast, the act of Connolly in aiding and abetting by meeting with and encouraging his co-defendants cannot satisfy this definition of an "act" which is "imminently dangerous to another" because his act self-evidently was not "reasonably **certain to kill**" even if one could conclude that his act was reasonably certain to *lead to*, or *result in,* death.  The statute requires an actual, active act that is "reasonably certain to kill" (or do serious bodily harm).  Montgomery, 39 So. 3d at 255; Coicou, 39 So. 3d at 243 n.4; Pressley, 395 So. 2d at 1177.  Common sense compels the conclusion that the act of Connolly in this case does not and cannot meet this definition.  Despite the majority's valiant effort, Connolly's act in this case did not and cannot transform the State's theory from an aider and abettor/principal theory to an "active co-perpetrator of the murder" theory.

Relatedly, the majority seeks to characterize the second-degree murder as a "continuing" or "on-going offense" in an attempt to bridge the temporal and spatial divide and thereby satisfy the "during the commission of" language of the statute.  See majority opinion at 51.  This effort misses the mark, and would serve to transform the discrete offense of second-degree murder into a conspiracy offense or some other type of continuing offense.  In support of this "continuing offense" theory, the majority relies upon Junco v. State, 510 So. 2d 909 (Fla. 3d DCA 1987).  However, this case does not support the majority's position.  In Junco, the defendant (who was armed) and several co-defendants, (who were also armed) committed a

134

robbery at a warehouse where marijuana was being stored. Two warehouse "guards" were killed in the course of the robbery, and another individual was injured. Junco left the scene prior to the shootings. Junco was convicted of two counts of second-degree murder with a firearm, attempted second-degree murder, robbery with a firearm, and trafficking in marijuana. The two murder convictions, and the attempted murder conviction, were reclassified under section 775.087(1), and the trial court also imposed four consecutive three-year minimum-mandatory sentences for the robbery, attempted murder, and two murder convictions (for possession of a firearm under 775.087(2)).

On appeal, and contrary to the majority's assertion (see majority opinion at 52), the defendant in Junco did not argue, and this court in Junco did not address, the propriety of the reclassification of the two murder and one attempted murder offenses.[45] Junco did raise, and this court did address, whether the trial court could properly impose consecutive minimum-mandatory sentences for the robbery (at which Junco was present and in which he participated) and for the two murders and the attempted murder committed by co-defendants soon after Junco left the scene of the crime.

Junco contended that these crimes comprised a single criminal episode, thus

---

[45] Junco did claim that the robbery was improperly reclassified and we held that the trial court properly reclassified this offense "because Junco did actually participate in the criminal offense while in the possession of a firearm. . . ." Id. at 913.

135

requiring that the minimum mandatory sentences be imposed concurrently.[46] The state argued that the robbery and the murders were separate and distinct offenses and therefore authorized consecutive minimum mandatory sentences.[47] Junco has nothing to do with whether the defendant possessed a firearm "during the commission of" the robbery or the murders. The issue was whether the crimes for which defendants were convicted were considered separate and distinct or a single criminal episode. This court held that, for purposes of imposing consecutive minimum mandatory sentences, the robbery and the murders, though they could be said to have occurred during a single criminal episode, were sufficiently separate in time so as to constitute two separate offenses. Id. at 913. Junco does not support the majority's conclusion that the facts in the instant case constitute a "single criminal episode." In Junco, the defendant went to a warehouse, armed with a firearm and accompanied by armed co-defendants, to commit a robbery. He participated actively in the robbery itself, and he fled the scene of the crime moments before his co-defendants murdered two people in the warehouse and attempted to murder a third person. This was a continuous, unbroken series of acts and events in which Junco was an active participant at a place and during the time the actual crimes

---

[46] The defendant in Junco relied for its argument upon Palmer v. State, 438 So. 2d 1 (Fla. 1983) and its progeny.

[47] The State in Junco relied for its argument upon State v. Enmund, 476 So. 2d 165 (Fla. 1985), State v. Thomas, 487 So. 2d 1043 (Fla. 1986), and Murray v. State, 491 So. 2d 1120 (Fla. 1986).

were being committed. By contrast, the instant case involves a significant temporal break and spatial divide between Connolly's act as aider and abettor in Boston and the actual commission of the murder three weeks later in Miami. [48]

Indeed, there are cases which address the relevance of spatial and temporal proximity in assessing whether the use of a firearm occurs "during the commission of" the offense. In Lemus v. State, 33 So. 3d 774 (Fla. 4th DCA 2010), the defendant was convicted of, inter alia, two counts of aggravated assault (with a firearm) each committed on a different police deputy. The evidence at trial established the following:

- At about 8 a.m., police responded to an apartment after receiving a 911 call from defendant's father.

- Ten minutes after their arrival, police heard a gunshot and SWAT officers were called to the scene.

- Twenty to thirty minutes later, defendant came out of the apartment with a

---

[48] The majority also relies upon Andrade v. State, 564 So. 2d 238 (Fla. 3d DCA 1990). In Andrade, the defendant was convicted of seven separate counts (three counts of attempted murder, and one count each of first-degree murder, armed robbery, conspiracy to traffic in cocaine, and resisting arrest with violence). Without any recitation of the underlying facts, or the course of events that led to the commission of these crimes, we held in Andrade that "the trial court did not, as urged, commit reversible error in enhancing the defendant's conviction on the three counts of attempted murder and in imposing three-year mandatory minimum sentences as to each of those convictions; this is so because the evidence establishes that the defendant possessed a firearm during the criminal episode in question." Id. at 239. Andrade does nothing to advance the majority's position.

137

gun in his hand and, ignoring police commands to drop the gun, fired a shot into the ground and returned inside the apartment.

- At 9 a.m. SWAT officers heard more gunshots inside the apartment, and attempted to position themselves to see inside the apartment.

- Defendant's standoff with police continued until about 4 p.m., when defendant came out of the apartment, pointed his gun at Deputy Brady (but did not discharge the gun), and retreated inside the apartment (the first aggravated assault).

- A short while later, defendant again came out of the apartment, pointed his gun at Deputy Davis (but did not discharge the gun) and again retreated inside the apartment (the second aggravated assault).

- Defendant later emerged from the apartment a final time and was arrested without further incident.

Applying section 775.087(2)(a)2. (the "10/20/Life" statute),[49] the trial court imposed a twenty-year minimum mandatory sentence for each of the aggravated assault convictions, finding that "during the course of the commission of" the aggravated assaults, defendant discharged a firearm. The Fourth District reversed

---

[49] Section 775.087(2)(a)2. provides in pertinent part that any person who is convicted of a qualifying offense (including an aggravated assault) "and during the course of the commission of the felony such person discharged a 'firearm'. . . shall be sentenced to a minimum term of imprisonment of 20 years."

these minimum mandatory sentences. The court began by noting that the meaning of the term "during the course of the commission of the felony" is a question of statutory construction: "Principles of statutory construction require that the statute's words be afforded their plain meaning, and, if there is any ambiguity, such ambiguity must be resolved in favor of the defendant (the rule of lenity)." Id. at 775. (citations omitted). The court then held that, applying these principles of statutory construction, the evidence could not support a finding that the defendant discharged a firearm "during the course of the commission of" the aggravated assaults:

> The aggravated assaults were committed when the defendant, using a gun, threatened and placed in fear Deputies Brady and Davis. See §§ 784.011(1) (defining crime of assault), 784.021 (defining crime of aggravated assault), 784.07(2)(c) (defining crime of aggravated assault on a law enforcement officer). The State argues that the phrase "during the course of" contained in section 775.087(2)(a)2. should be interpreted to mean any action occurring during the "temporal episode" surrounding the charged criminal offense. The State thus maintains that since Lemus fired a revolver while earlier engaged in the standoff, the weapon was fired during the "criminal episode" of the aggravated assault offenses. We reject the State's broad interpretation of the statute as contrary to both the plain meaning of the statute and the "rule of lenity." The evidence at trial established that the defendant's discharge of the firearm, by firing a shot into the ground, took place some seven hours prior to his threatening Deputies Brady and Davis with a gun, i.e., the commission of the aggravated assaults. Indeed, there was no evidence that either Deputy Brady or Deputy Davis actually saw, or was aware of, the defendant firing a shot into the ground. Under the circumstances of this case, it cannot be said that the discharge of the firearm occurred "during the course of the commission" of either of the aggravated assault charges.

Id. at 776 (emphasis added).

139

Although Lemus involved the imposition of a minimum mandatory sentence under the 10/20/Life statute, it is nevertheless instructive. Lemus construes operative statutory language ("during the course of the commission of the felony") that is very similar to that of the reclassification statute ("during the commission of" the felony). The Lemus court held that the act of the defendant in discharging the firearm several hours before committing the aggravated assaults (by threatening the deputies with the firearm) could not reasonably be said to have occurred during the course of the commission of the aggravated assaults. The decision in Lemus underscores the relevance of spatial and temporal proximity in assessing whether one's possession or use of a firearm occurred "during the commission of" the offense. In the case before us, it is clear that Connolly's carrying of the firearm was not related, in the episodic sense, to the commission of the murder.

The Fourth District later referenced and distinguished Lemus in a case in which the defendant discharged a firearm during a single continuous criminal episode. See Chavers v. State, 112 So. 3d 594 (Fla. 4th DCA 2013). In doing so, the court in Chavers aptly described Lemus as involving "criminal episodes [which] were spatially and temporally distinct." Id. at 595. In the instant case, as in Lemus, the acts of Connolly and the actual commission of the murder were spatially and temporally distinct. In the instant case, as in Lemus, there is no single continuous criminal episode which would permit a conclusion that Connolly's carrying of a

140

firearm occurred during the commission of the murder.

Finally, one cannot easily ignore this Court's decision in Crimson v. State, 390 So. 2d 152 (Fla. 3d DCA 1980).[50] In that case, Crimson lent his firearm to several other individuals, knowing that this firearm would be used by them in committing an armed robbery. Crimson was convicted of armed robbery as a principal (aiding and abetting the armed robbery by providing co-defendants with the firearm used in the crime). The trial court's sentence of Crimson included a three-year mandatory minimum term because Crimson was convicted of the robbery and had in his possession a firearm. See § 775.087(2), Fla. Stat. (1979).[51] On appeal, this court reversed the sentence, reasoning:

> The three culprits who were at the scene of the crime, who did not handle the gun, could not have been given a three-year minimum sentence upon conviction of armed robbery. Therefore, we find it was error to give the appellant a three-year minimum sentence upon conviction, when he was not present at the scene.

Although Crimson involved imposition of a mandatory minimum sentence (rather than reclassification) the same principles are present. In fact, Crimson provides an even more compelling set of facts, given that the defendant supplied his

---

[50] Neither party cited to this case during the initial briefing or during the supplemental briefing on rehearing en banc.

[51] In 1979, section 775.087(2)(a), Florida Statutes, read in relevant part: Any person who is convicted of: . . . robbery. . . and who had in his possession a "firearm". . . shall be sentenced to a minimum term of imprisonment of 3 calendar years.

141

co-defendants with the very same firearm that was used in the armed robbery. However, this was not deemed sufficient to warrant imposition of the three-year minimum mandatory, where Crimson himself was not present at the scene and thus did not actually possess any firearm during the commission of the crime.

Implicit in this holding is a recognition that Crimson's possession of the firearm and lending it out, did not constitute the commencement of the armed robbery. Nor was Crimson's possession of the firearm connected episodically with the actual commission of the crime, and therefore could not serve as a basis for the enhanced sentence. Applying the logic and reasoning of Crimson, Connolly's act of aiding and abetting while carrying a firearm cannot support reclassification.

### D. Conclusion

There can be little doubt that this is a hard case. But, as Justice John Harlan acknowledged more than a century ago, "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." U.S. v. Clark, 96 U.S. 37, 49 (1877) (Harlan, J., dissenting) (quoting Lord Campbell in East India Co. v. Paul, 7 Moo. 85, 111 (P.C. 1840)). The law is as clear as our duty to apply it. Connolly did not carry a firearm "during the commission of" the murder: His carrying of a firearm occurred during the episodically remote act of aiding and abetting a murder that was subsequently committed by others. While he is equally culpable as a principal for the second-degree murder committed

142

by his co-principals, Connolly's conviction cannot be reclassified to a life felony, and remains a felony of the first degree. Because prosecution for this first-degree felony was not commenced within four years after it was committed,[52] the conviction, judgment and sentence for second-degree murder are barred by the expiration of the statute of limitations.

I conclude therefore that we must reverse with directions to vacate the judgment and sentence and enter a judgment of acquittal. For these reasons, I respectfully concur in part and dissent in part.

SUAREZ, C.J., and SHEPHERD and LAGOA, JJ., join in the dissent only and concur that we must reverse with directions to vacate the judgment and sentence and enter a judgment of acquittal.

---

[52] See § 775.15(2)(a), Fla. Stat. (1981), which provided: "A prosecution for a felony of the first degree must be commenced within 4 years after it is committed."

143